# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-4045

LOCAL 65-B, GRAPHIC COMMUNICATIONS CONFERENCE
OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS,

*Petitioner,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent,*

and

QUBECOR WORLD MT. MORRIS II, LLC,

*Intervenor.*

On Petition for Review of an Order of the
National Labor Relations Board

ARGUED MAY 28, 2009—DECIDED JULY 10, 2009

Before BAUER, FLAUM, and KANNE, *Circuit Judges.*

FLAUM, *Circuit Judge.* Local 65-B, Graphic Communications Conference of the International Brotherhood of Teamsters, a collective bargaining representative for

some of the employees at a commercial printing plant in Mt. Morris, Illinois, brought an unfair labor practices charge against Quebecor World Mt. Morris II, LLC, the plant's owner. The union alleged that the plant's management had imposed a new employee disciplinary system, and demoted one employee under that system, without first negotiating that change in working conditions with the union. The substance of that charge turns on the validity of a management rights provision in the parties' previous collective bargaining agreement; if the agreement with the management rights clause was extended (the company's position) then management had the authority to change certain working conditions without negotiating with the union first. If the old collective bargaining agreement was not extended but, instead, had expired when the company put the new system in place (the union's position) then the management rights clause was no longer in effect and, consequently, management could not have made any changes to working conditions without negotiating first.

The validity of the management rights provision, in turn, depends on whether the company and the union agreed orally to extend the old collective bargaining agreement during their negotiations. The Administrative Law Judge assigned to the case initially concluded that the parties had not agreed to extend the old agreement; the National Labor Relations Board reversed that determination and dismissed a portion of the union's complaint. The union now petitions for review.

For the following reasons, we find that the Board's conclusion that the parties agreed to extend the

contract, including the management rights clause, is supported by substantial evidence and we deny the petition for review.

## I. Background

Quebecor World Mt. Morris II, LLC ("the company"), owns and operates a large commercial printing plant in Mt. Morris, Illinois. Local 65-B of the Graphic Communications Conference of the International Brotherhood of Teamsters ("the union") is the bargaining representative for 275 employees in the company's finishing department, and has been their representative since approximately 1918.

The last collective bargaining agreement that the company and the union entered into prior to the present litigation expired on March 31, 2006. In March 2006, consequently, various representatives from the company and the union sat down to negotiate a new agreement in a joint bargaining session sometime prior to March 31 (the exact date is unimportant, but the union says the exchange took place on March 31, while the NLRB claims that it could have happened on March 30). At any rate, the company's representatives brought up the idea of setting forth a written extension of the current contract, which would last until the parties had reached an agreement on a new CBA. One of the union's representatives, Dave Strohecker, testified about that discussion in the hearing before the ALJ (he offered the testimony when examined by counsel for the union):

Q: Mr. Strohecker, with respect to the status of the expired agreement were you present when there was a discussion between Mr. Roberts [a union negotiatior] and Mr. McCarthy [a company negotiator]?

A: Yes, I was.

Q: And what was that discussion about?

A: About the expiration of the agreement.

Q: And what date—or when did that take place?

A: It was either the day before or the day of the expiration.

Q: And in what context did it take place?

A: We were in a contract bargaining meeting.

Q: Okay. And Mr. Mc—

A: McCarthy.

Q: McCarthy. What did Mr. McCarthy say, and what did Mr. Roberts say?

* * *

A: Mr. McCarthy asked if we were going to sign a written extension. And—because he said that it was their intention to work under our current agreement. And Mr. Roberts said that we didn't see any need for a written extension. That it was our intention, too, to just work under the current agreement. And Mr. McCarthy said he was okay with that. That was the extent of the conversation.

Ron Slade, an employee in the company's human resources department, also testified that the parties agreed orally to extend the existing contract. Here is his testimony from the hearing:

> Q: Did he [Roberts] say to your recollection that the parties would agree to—that the Union would agree to work under the terms of the old contract?
>
> A: Yes.
>
> Q: Did he say anything more than that?
>
> A: Tom, we've been negotiating for a long time. I can't—I can't recall. There's been a lot of things said. But I confirmed honestly the conclusion.

At least at the time that the NLRB issued its opinion below, the two sides had still not come to an agreement on a new collective bargaining agreement. The old collective bargaining agreement contained a number of terms, including a management rights clause in Article IV of the CBA, stating that:

> Except as limited by the express provisions of this Agreement, the Company shall have the exclusive right to manage the plant and to direct the working forces including, but not limited to, the right to direct, plan and control plant operations; to assign employees; to establish and change work schedules; to hire, recall, transfer, promote, demote, suspend, discipline or discharge for cause; to layoff employees because of lack of work or other legitimate reasons; to establish and apply reasonable standards of performance and rules of conduct . . .

The central dispute in this case is whether or not that clause remained in effect after the collective bargaining agreement nominally expired on March 31, 2006. If the parties orally agreed to extend the CBA, as the company and the NLRB claim, then the CBA—together with all of its ancillary clauses—remained in effect during the course of the negotiations. The union contends, however, that they did not agree to extend the CBA but were simply stating their intention to work under certain terms of the agreement that, under the NLRA, the employer could not change during the negotiation process.[1]

This difference matters because the company later took disciplinary action against one employee, Robert Gigous, and did so by means of a seemingly new procedure. On September 7, 2006, two supervisors met with Gigous and told him they were placing him on a "90 Shift Performance Improvement Plan" for unsatisfactory performance. The Administrative Law Judge found that Gigous was the first bargaining unit employee subject to "90 Shift Performance Improvement Plan." Previously, the company had addressed unsatisfactory performance through a progressive discipline policy stepping up from a verbal warning, a written warning, administrative

---

[1] Under *NLRB v. Katz*, 369 U.S. 736 (1962), an employer's unilateral changes to certain bargaining subjects, such as wages, hours, and working conditions, during the time of negotiations can constitute an unfair labor practice. *Id.* at 747-48. The union contends that its intention was simply to accept this default position, and keep in place those terms from the old CBA that, legally, the employer could not change.

suspension, actual suspension, and then, assuming none of the above had worked, termination. The company implemented the new performance improvement plan without winning the union's agreement to it in any of the ongoing negotiation sessions.

The next day, Strohecker wrote to Slade objecting to the plan, and requesting additional information about it. The union then filed a step one grievance on September 11, 2006 and put the grievance in writing the next day. The grievance did not proceed any further than that because the company and the union never held a step two grievance meeting. Gigous was subsequently demoted, pursuant to the performance plan, on February 26, 2007.

The union filed an unfair labor practices charge with the NLRB on March 1, 2007 and amended the charge on May 30, 2007. The parties held an evidentiary hearing before an ALJ on September 17, 2007 and the ALJ issued factual findings and a recommended order finding that the company violated § 8(a)(5) and (1) of the NLRA by unilaterally implementing the performance improvement plan as a disciplinary measure and changing the working conditions of employees, demoting Gigous under the plan, and not providing the union with information about the plan and Gigous' demotion.

There are conflicting statements in the hearing transcript about the theory of the case brought by the Board's General Counsel. At one point, in the opening statement, the general counsel stated that, "The evidence will show that they've agreed to work under the terms of the last

agreement." The ALJ then asked, "Oral extension?" The general counsel responded, "Yes." Later, however, the general counsel for the NLRB and the ALJ had an exchange which seems to demonstrate a different theory. The general counsel stated that, "My understanding and would think our evidence would be that the parties have continued to work under the terms [of the expired CBA], which I believe is somewhat different than an oral extension." The ALJ responded, "Oh, I understand that."

Ultimately, with respect to the issue of the extension of the then-existing collective bargaining agreement, the ALJ found that,

> Undisputed testimony establishes that, at a bargaining session shortly before the expiration of the prior agreement, Company spokesperson David McCarthy asked if the Union was going to "sign a written extension." Union spokesperson Phil Roberts replied that he did not "see any need for a written extension," that it was the Union's intention to continue to "work under the current agreement." McCarthy replied that he was "okay with that." There was no written extension of the collective bargaining agreement.

A two-member panel of the NLRB later reversed the ALJ's finding that the company committed an unfair labor practice by unilaterally implementing the performance improvement plan. The Board found that while the parties had not entered into a written extension of the terms of the contract, they had agreed to an oral extension in Roberts and McCarthy's exchange during the negotiating session. As the Board concluded:

On or about March 31, 2006, the date that the parties' most recent collective-bargaining agreement was set to expire, the chief negotiators for the Respondent and the Union orally agreed, without qualification, to extend the collective-bargaining agreement while they negotiated a successor contract. It is undisputed that at all relevant times in this case, the parties understood that they were operating under the terms of the expired contract, as extended.

Because the oral extension of the contract would have extended the management rights clause, the company was within its rights to implement the performance improvement plan and demote Gigous. The union now appeals from the NLRB's decision.

## II. Discussion

The issue before us in this appeal is whether substantial evidence supports the Board's determination that the parties agreed to extend the previous collective bargaining agreement, including the management rights clause. We apply a deferential standard of review to rulings from the NLRB. *SCA Tissue North America LLC v. NLRB*, 371 F.3d 983, 987 (7th Cir. 2004). We review its factual findings for substantial evidence and its legal conclusions for a reasonable basis in law. *Sears, Roebuck & Co. v. NLRB*, 349 F.3d 493, 502 (7th Cir. 2003). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion of the Board." *Huck Store Fixture Co. v. NLRB*, 327 F.3d 528, 533 (7th Cir. 2003). Under the substantial evi-

dence test, a reviewing court may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Universal Camera v. NLRB*, 340 U.S. 474, 488 (1951). However, "When the Board purports to be engaged in simple factfinding, unconstrained by substantive presumptions or evidentiary rules of exclusion, it is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands. 'Substantial evidence' review exists precisely to ensure that the Board achieves minimal compliance with this obligation, which is the foundation of all honest and legitimate adjudication." *Allentown Mack Sales and Service, Inc. v. NLRB*, 522 U.S. 359, 378-79 (1998). The NLRB is of course free to adopt findings of fact and conclusions of law different from the ALJ's conclusions, but its decision must still conform with the substantial evidence standard. "[O]n matters which the [ALJ], having heard the evidence and seen the witnesses, is best qualified to decide, the agency should be reluctant to disturb his findings unless error is clearly shown." *Universal Camera*, 340 U.S. at 494. When we review the NLRB's decision, "the ALJ's decision (including his findings of fact) is as much a part of the record as the evidence put before the ALJ, and we must consider the ALJ's views in deciding whether the Board's order is supported by substantial evidence." *Slusher v. NLRB*, 432 F.3d 715, 727 (7th Cir. 2005).

The core question in this appeal is whether substantial evidence supported the Board's determination that the

parties orally agreed to extend the contract, along with the crucial management rights clause. If the parties did not agree to extend the contract past its expiration date but instead only agreed to keep in place those terms that the NLRA required them to keep in place during the negotiations, then the company's imposition of a new disciplinary scheme was an unfair labor practice. The NLRB has previously determined that, "A contractual reservation of managerial discretion . . . does not survive expiration of the contract that contains it, absent evidence that the parties intended it to survive." *In re Guard Publishing Co.*, 339 NLRB 353, 355 (2003). If such a clause is not in effect, then changes to working conditions are mandatory bargaining subjects under § 8(d) of the NLRA. The employer cannot make any changes to those conditions without bargaining with the employees' representative. *See, e.g.*, *Litton Financial Printing Div. v. NLRB*, 501 U.S. 190, 198 (1991).

The union claims that the Board, in concluding that the parties agreed to extend the collective bargaining agreement, reversed a credibility determination of the ALJ and did so without analyzing the record to identify a clear error on the part of the ALJ. The Board presents us with the preliminary question of whether the union is barred from making this argument because they did not raise it before the Board. § 10(e) of the NLRA bars us from considering arguments that the party petitioning for review did not raise before the Board. The Board now argues that the ALJ's decision rejected the company's contention that the management rights clause remained in effect because the ALJ found that the companies had not

entered into a formal, written extension of the contract. The union should have sought review of that finding and argued before them that the parties did not agree orally to extend the CBA. As they failed to raise that objection to the Board, according to this argument, it is now waived.

The union contends that their position has always been that the parties did not agree to extend the collective bargaining agreement past March 31 and that the Board was on notice about the arguments that they are now making. We have ruled on similar jurisdictional claims before, albeit not recently. § 10(e) and its implementing regulations do require a party to file an exception to any objectionable factual or legal determination of an ALJ. *See* 29 C.F.R. § 102.46(b)(1). In *Barton Brands, Ltd. v. NLRB*, 529 F.2d 793 (7th Cir. 1976), however, we held that a party petitioning for reviewing of the NLRB's decision to reverse the ALJ need not always file an exception, since the factual findings of the ALJ were before the Board and it is presumably the reversal of those factual findings that the petitioner is now objecting to. *Id.* at 801.

It is true that the union, if it wanted to cover all its bases, might have argued that the ALJ should have found that the parties not only did not enter into a written agreement to extend the contract but did not enter an *oral* agreement to do so, either. The ALJ did not make an adverse finding to the union on that point, however. They would have had no need to file an exception on that point. The Board also argues that the union

should have petitioned the Board for reconsideration of its decision. We have held that a petition for reconsideration is not required under § 10(e), however. *U.S. Marine Corp. v. NLRB*, 944 F.2d 1305, 1319 n. 17 (7th Cir. 1991).

We proceed, then, to the merits of the argument. The union claims that the NLRB reversed a critical factual finding of the ALJ and did so without finding further support in the record. The union frames the ALJ's finding that, "[t]here was no written extension of the collective bargaining agreement" as a credibility determination based on the testimony presented to the ALJ.

The union has good reasons for casting the ALJ's decision as a credibility determination, as we have previously said that "any of the ALJ's findings that turn on express or implied credibility determinations take on particular significance on review." *Slusher*, 432 F.3d at 727. However, a credibility determination is a decision about whether or not to believe testimony in the first place or which witness to believe when testimony conflicts. *Id.* (assessing motive requires credibility determinations about witnesses); *see also United States v. Williams*, 553 F.3d 1073, 1080 (7th Cir. 2009) (discussing credibility determination). But the difference between the ALJ's opinion and the Board's opinion was not a decision to credit different pieces of testimony. The ALJ and the Board simply disagree about what conclusion to

draw from the same piece of testimony.[2] The evidence in the record about the extension of the contract is rather thin; both sides cite the testimony of Dave Strohecker as supporting their view of the case. The ALJ and the Board both took that testimony at face value, they simply reached different conclusions about what it meant.

Second, what testimony there is provides equal support to both the Board's and the ALJ's view of the case. Strohecker's testimony was surprisingly ambiguous about just what the parties agreed to. One could reach the same conclusion as the ALJ, and decide that when Roberts said he "didn't see any need for a written extension" he was turning down the company's offer to extend the contract. Or one could use that same testimony to support the Board's determination that since he did not see any need for a written extension and that it "was our intention, too, to just work under the current agreement" that the union was accepting the company's proposal and did not see the need to negotiate a formal written extension of the old collective bargaining agreement. (While Strohecker's testimony was second-hand, his

---

[2] The Board's opinion cited Strohecker's testimony in footnote six of its opinion, in support of its finding that "On or about March 31, 2006, the date that the parties' most recent collective-bargaining agreement was set to expire, the chief negotiators for the Respondent and the Union orally agreed, without qualification, to extend the collective-bargaining agreement while they negotiated a successor contract." The ALJ, of course, cited the same piece of testimony when discussing the same issue.

statement that it "was our intention, *too*" can reasonably be viewed as endorsing the company's basic proposal.)

This is a close question, but the Board's conclusion is not one that we can reverse under the substantial evidence standard. Rather than being a credibility determination, this case turns on competing inferences. While Strohecker's testimony may give rise to several equally valid interpretations, the NLRB's is supported by the record and is at the very least a rational conclusion based on the testimony (even if the conclusion is not, as they claimed in their opinion, undisputed).

The union objects that the NLRB should not have overturned the ALJ's conclusions without citing further evidence in the record. There is, however, additional testimony in the record from Strohecker that the management rights provision was in effect during the negotiation period.[3] That bolsters the Board's conclusion that

---

[3] The relevant testimony follows.

> Q: (By Mr. Haman) And so then I take it the grievance procedure and the management rights provision of Respondent's No. 1 has been in effect for all times covered by the chart and the grievance?
>
> A: Correct.

Counsel for the union objected that the question called for a legal conclusion, although the ALJ disagreed. The question was also compound, since it asks about the grievance procedure and the management rights provision. But Strohecker also said, in response to a similar question about the grievance

(continued...)

the parties agreed to extend the CBA. Moreover, the only other witness to testify at the hearing, Ron Slade, also claimed that the parties agreed to extend the CBA, although his testimony was more conclusory than Strohecker's.

The union also raises two additional arguments for reversing the Board's decision. First, they claim that the Board overruled, without explanation, two cases in which it held that an agreement to work under certain terms of a contract was not in itself an agreement to extend the entire contract. In *S.W. Motor Lines, Inc.*, 236 NLRB 938 (1978), the Board determined that, when there was conflicting testimony about whether the parties decided to extend a contract and the only written agreement concerned the retroactive application of benefits, there was no agreement to extend the contract but only to extend certain terms of it. In *Cardinal Operating Company*, 246 NLRB 279 (1979) the Board determined that an employer's statement that it intended to abide by its obligations under an expiring collective bargaining agreement was not an effective extension of all of the terms of that agreement. The union contends that this case is very much in line with those previous two cases and that the NLRB has effectively overruled them *sub silentio*.

---

[3] (...continued)

procedure and management rights provision, "[w]ell, we're working under this agreement" referring to the old collective bargaining agreement, which presumably would include both provisions.

The Board first contends that the union has waived this argument by not presenting it as an exception to the ALJ's finding or in a motion to reconsider, but the argument is even weaker here than it was with respect to the first argument. The union obviously had no way of knowing that the Board would (in their view) overrule its precedent prior to the final decision. The argument, accordingly, does not appear to have been waived.

The cases cited by the union are distinguishable on their facts. In both *S.W. Motor Lines* and *Cardinal Operating Company* the Board determined that the parties had not agreed to an extension of the collective bargaining agreement. The present case, however, is not one where the parties agreed to extend certain terms and not others but rather one where they agreed to extend the entire CBA. Insofar as those two cases appear to stand for a different legal principle—namely that an agreement to extend some terms of a collective bargaining agreement is not an agreement to extend all the terms, and that both parties must agree to an extension for it to be enforceable—the Board was not inconsistent with its prior precedent, and its legal conclusion was reasonable.

The union finally argues that the Board's decision is inconsistent with the Supreme Court's decision in *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693 (1984). In *Metropolitan Edison* the Court held that a union's waiver of its statutory rights (including the right to bargain over changes to working conditions) must be "explicitly stated" and "clear and unmistakable." *Id.* at 708. The union argues that the waiver in this case was neither of those

things. Even if we were to accept the testimony before the ALJ as evidence of an extension of the previous collective bargaining agreement, there was no discussion about key contractual provisions (such as arbitration, wages, hours, disciplinary action, etc.) and thus no explicit waiver of the union's statutory rights.

No one disputes that the management rights provision of the previous contract was a valid waiver of the union's statutory rights, however. An agreement to extend that prior collective bargaining agreement was a clear and unmistakable waiver of those same rights, since the union's negotiators could be fairly charged with knowledge of the prior agreement and the consequences of extending that agreement. If the NLRB's key fact finding is correct, then, their decision is consistent with *Metropolitan Edison*.

### III. Conclusion

For the foregoing reasons, we DISMISS the petition for review.