In the

# United States Court of Appeals
## For the Seventh Circuit

––––––––––––––––––

Nos. 22-2674 & 23-3172

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150, AFL-CIO,

*Petitioner, Cross-Respondent,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent, Cross-Petitioner,*

*and*

TROY GROVE and VERMILION QUARRY,

*Intervening Respondents.*

––––––––––––––––––

Petition for Review and Cross-Application for Enforcement of an Order
of the National Labor Relations Board.
Nos. 25-CA-234477, 25-CA-242081, 25-CA-244883, 25-CA-246978.

––––––––––––––––––

Nos. 23-1014 & 23-3172

TROY GROVE and VERMILION QUARRY,

*Petitioners, Cross-Respondents,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent, Cross-Appellant,*

*and*

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 150, AFL-CIO,

*Intervening Respondent.*

————————————

Petition for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board.
Nos. 25-CA-234477, 25-CA-242081, 25-CA-244883, 25-CA-246978.

————————————

ARGUED MAY 15, 2024 — DECIDED JULY 23, 2024

————————————

Before BRENNAN, KIRSCH, and LEE, *Circuit Judges*.

BRENNAN, *Circuit Judge*. In early 2018, employees represented by the International Union of Operating Engineers, Local 150, went on strike at two quarries. During that strike, the mining company operating those quarries, RiverStone Group, Inc., disciplined and discharged a union member, required another union member to sign a hiring list when he wanted to return to work, changed a company policy unilaterally, and removed picket signs. Local 150 believed these actions were unfair labor practices in violation of the National Labor Relations Act. So, Local 150 filed charges with the National Labor Relations Board. The Board issued a complaint against RiverStone. An administrative law judge ruled that RiverStone

violated the Act as charged. RiverStone appealed to the Board, and the Board affirmed the ALJ's decision in part.

Local 150 and RiverStone ask us to review the Board's final decision and order. The Board requests that we enforce its order in full. After review of the administrative record and consideration of the parties' arguments, we see no error in the Board's order. Substantial evidence and applicable labor law support the Board's order, so we deny the petitions for review and grant the Board's cross-application for enforcement.

## I

### A

RiverStone Group, Inc. is a mining corporation that operates the Troy Grove and Vermillion Quarries, located in north central Illinois. The International Union of Operating Engineers, Local 150 ("the union" or "Local 150") represents a bargaining unit of employees who work at both quarries. In May 2016, the collective bargaining agreement between RiverStone and Local 150 expired. Nearly two years later, Local 150 elected to strike.[1] Local 150 asserts that Riverstone employed unfair labor practices during the strike, and this case arises from the National Labor Relations Board's resolution of those claims. The union's allegations concern actions involving individual employees and decisions affecting the entire bargaining unit. We review those four sets of allegations now.

*Matt Kelly's Disciplinary Issues, Investigatory Interview, and Discharge.* After Local 150 voted to strike, RiverStone hired replacement workers, including Matt Kelly. From when he started work in May 2018 to his discharge on August 14, 2019,

---

[1] After nearly five years, the strike ended on February 22, 2023.

Kelly committed multiple disciplinary infractions. RiverStone uses a progressive disciplinary policy for its employees. That policy defines four infraction types: safety, performance, attendance, and conduct. Safety and conduct violations escalate in three steps: a written warning, a final warning or suspension, and then termination. For performance and attendance infractions, employees receive an additional, initial warning. Attendance violations are tracked over a twelve-month period. And RiverStone prohibits the use of cell phones in areas outside of workshop or office areas unless there is an emergency.

Kelly's disciplinary issues began one year into his employment on May 2, 2019, when he reported sixteen minutes late to work at the Vermillion Quarry. Scott Skerston, the Quarry's superintendent, issued Kelly a written warning dated May 6.[2] On that day, Kelly revealed his union membership when he wore a Local 150 t-shirt to work. Kelly and Skerston spoke about the former's union membership, and Kelly told Skerston he would be quitting his job on May 9.

On May 7, Skerston observed Kelly recording a video on his cell phone while driving a company truck. Skerston wrote a safety infraction warning and discussed the violation with Kelly. That same day, Skerston wrote Kelly up again, this time for entering the workshop five times while he was supposed to be in the quarry pit and for deficient performance.

The following day, Kelly committed his second attendance infraction when he punched in for work thirty minutes late.

---

[2] Kelly acknowledges the incident occurred on May 2, 2019.

Skerston wrote up a warning and discussed the infraction with Kelly.

On May 9, Skerston wrote up Kelly a fifth time, this time for dragging a portable welder across the ground. Because this was Kelly's second safety violation, Skerston issued a "final" safety warning. In the employee signature line, Skerston wrote that Kelly "quit today." Kelly would later testify that he did not sign any of these five written warnings because he did not see them until August 7.

Kelly quit on May 9, and he provided Skerston written notice that he was going on strike to protest unfair labor practices. But Kelly's strike did not last long. A few weeks later, Kelly provided Skerston with his unconditional offer to return to work, and RiverStone reinstated him in early July.

Upon his reinstatement, Kelly resumed committing infractions. On July 10, Skerston issued Kelly a final written warning for a third safety violation—working on a conveyor without the proper safety equipment. This time, Kelly signed the warning, though he later testified that he "didn't see that it was a final warning." On August 7, Kelly arrived fifty-four minutes after the start of his shift. This was his third attendance infraction, so Skerston issued him a final written warning, though he did so without discussing it with Kelly. Kelly refused to sign this notice, he testified, because "it said final warning and I hadn't received any other write-ups." Then, on August 14, just before 6 a.m., Kelly called Skerston and told him his motorcycle had a flat tire, and his friend was taking him home so he could drive his truck to work. Kelly did not arrive at the Vermillion Quarry until 11:30 a.m., five-and-a-half hours into his shift.

Skerston summoned Kelly for a disciplinary interview. Also present was Tom Becker, superintendent at the Troy Grove Quarry. Kelly requested that Lyle Calkins, Local 150's steward, attend. Skerston declined Kelly's request because Calkins was 25 minutes away at the Troy Grove Quarry, "too far away" in Skerston's estimation. Instead, Skerston suggested that Bob Gibson, another Vermillion Quarry employee, join, though Gibson held no leadership position in Local 150. Kelly agreed. But when Gibson arrived, he also asked for Calkins to be there.

Skerston and Becker interviewed Kelly without Calkins, asking about Kelly's tardiness. Skerston issued Kelly a notice of suspension. Kelly signed the notice but then crossed out his signature because he was not provided the previous warning referred to in the notice. Later that day, Skerston sent Kelly a notice of termination, citing his attendance infractions on May 6 and 8 and August 7 and 14.

Before the events between May 2 and August 15, 2019, Kelly received only one other write-up. In the two years before Kelly's termination, RiverStone discharged no other employees, though it issued warnings to six different employees for twelve different safety, attendance, and cell phone use infractions.

*Joe Ellena's Strike and Offer to Return to Work.* RiverStone also hired Joe Ellena as a replacement worker at the Troy Grove Quarry. After working nearly a year, Ellena, a Local 150 member, went on strike to protest unfair labor practices. Less than two months into his strike, though, Ellena submitted a letter to Skerston with his unconditional offer to return to work. Skerston replied, informing Ellena that no jobs were available at that time. Skerston also instructed Ellena to sign

a preferential hiring list located at the Vermillion Quarry. The list stated, "[b]y signing … you unconditionally offer to return to work … . Employees will be recalled to work based on the date and time of their offer to return to work." Ellena did not sign the list.

*January 2019 Punch-In Policy.* At the Troy Grove Quarry, employees work a ten-hour shift from 6 a.m. to 4 p.m., Monday through Thursday. Before January 2019, RiverStone had no policy regarding punching-in to work before the official shift start time. The expired collective bargaining agreement governed shift times and pay rates, but it did not speak to pre-shift punch-ins. It stated only that, if RiverStone adopted a work week of "four (4) days at ten (10) hours[,] … overtime [would] be paid after ten (10) hours in any one work day."

Numerous employees took advantage of this language, punching in anywhere between 5:35 a.m. and 6:00 a.m. Notably, six of RiverStone's fourteen employees commonly punched in up to twenty-five minutes early, with at least one having done so since 2001. Some employees did this "every day." These employees received overtime pay—time-and-a-half—for punching in early. RiverStone knew of this practice; its superintendents checked employee timecards.

In January 2019, one employee decided to test the limits of this practice. Despite not doing so previously, the employee punched in thirty minutes early on three consecutive days and received overtime pay. A week later, RiverStone posted a notice near the timeclock stating, "there is to be no punching in earlier than 5 minutes prior to normal start time without superintendent authorization." RiverStone did not notify Local 150 before posting the notice, and Local 150 was not offered the opportunity to bargain about the notice's terms.

*Picket Sign Removal.* As part of Local 150's strike, its members manned picket lines at the quarries, often with printed signs that they were on strike. In January 2019, two Local 150 members were working the Troy Grove Quarry picket line. The quarry had two driveways for entry and exit, and Local 150 found these driveways to be good locations for their picket signs. So, they placed the signs—four total measuring 15 inches by 24 inches—on each side of both driveways. To anchor the signs in the ground, the strikers placed ten-inch-long pieces of PVC pipe into the ground. The signs were placed into the pipes each morning and removed every evening.

One afternoon, the two strikers observed James Misercola, a RiverStone employee known as a "persuader"—someone who communicated with other employees to secure "no" votes in union elections—depart from the other side of the quarry in a truck. Before leaving, the truck drove back and forth a few times in the driveway, stopped, and then exited the quarry. When the vehicle left, a sign was gone. The two strikers later testified that the sign could not have blown away because it had been placed in a PVC pipe holder. Misercola testified that he did not remove the sign.

**B**

Local 150 filed several charges with the Board against RiverStone alleging that these various incidents constituted unfair labor practices in violation of the National Labor Relations Act. In response, the Board's General Counsel issued an unfair labor practices complaint against RiverStone. The complaint alleged that RiverStone violated various provisions of the Act by: (1) interviewing Kelly after denying his request for the presence of the Local 150 steward, Calkins; (2) disciplining

and discharging Kelly for his union activity; (3) requiring El-
lena to sign the preferential hiring list as part of his uncondi-
tional offer to return to work; (4) removing a picket sign from
public property via its agent, Misercola; and (5) unilaterally
implementing a new punch-in policy.

After briefing, an ALJ held a two-day hearing. The ALJ
then issued a written decision, ruling that RiverStone violated
the Act as alleged in the complaint. Specifically, the ALJ found
that Kelly's union activity was a motivating factor for his dis-
cipline and discharge. The ALJ made the additional finding
that RiverStone's discipline of Kelly demonstrated pretext,
such that RiverStone could not show that it would have disci-
plined and terminated Kelly regardless of his union activity.
RiverStone appealed the ALJ's decision to the Board.

The Board upheld the ALJ's decision in part. It agreed that
RiverStone violated Section 8(a)(1) of the Act by removing the
picket sign, requiring Ellena to sign the preferential hiring list
as part of his unconditional offer to return to work, and con-
tinuing Kelly's interview after denying his request for the
presence of a Local 150 representative.[3] The Board also con-
curred that RiverStone violated Section 8(a)(5) of the Act by
implementing a new punch-in policy without notifying Local
150 or providing an opportunity to bargain. However, past
Board decisions did not extend this violation to strike replace-
ments.

---

[3] The ALJ also decided that requiring Ellena to sign the preferential
hiring list violated 29 U.S.C. § 158(a)(3) (Section 8(a)(3) of the Act), but the
Board declined to address this finding, "as doing so would not materially
affect the remedy."

The Board disagreed with the ALJ's determination that RiverStone violated Sections 8(a)(1) and (a)(3) by disciplining and ultimately discharging Kelly. In the Board's view, the record demonstrated that RiverStone acted consistently with its progressive discipline policy. The Board was also unconvinced that RiverStone's failure to provide Kelly with copies of his disciplinary warnings sufficiently demonstrated pretext. Therefore, RiverStone "met its burden of proving, by a preponderance of the evidence, that it would have disciplined and ultimately discharged Kelly even absent his union activity."[4] The Board ordered RiverStone to cease and desist from the found violations and to perform certain remedial actions.

Local 150 filed a petition for review in our court, and RiverStone filed its petition in the D.C. Circuit. RiverStone's petition was transferred to us, and the Board filed a cross-application for enforcement of its order. We have jurisdiction to review the Board's determinations under 29 U.S.C. § 160(e). We now turn to those decisions.

## II

The parties ask us to review five issues. Two pertain to Matt Kelly: (A) RiverStone challenges the Board's decision that it violated the Act by denying Kelly the presence of a union steward at his disciplinary interview; and (B) Local 150 asserts the Board incorrectly concluded that RiverStone did not violate the Act by disciplining and discharging Kelly. RiverStone also objects to the Board's conclusion that the company violated the Act by (C) requiring Joe Ellena to sign the preferential hiring list, (D) removing a Local 150 picket sign

---

[4] One Board member agreed with the ALJ's finding that RiverStone unlawfully disciplined and discharged Kelly, issuing a written dissent.

from public property, and (E) unilaterally implementing a new punch-in policy. On the punch-in policy issue, the union offers arguments as well, contending the Board erred in finding that the violation did not extend to replacement workers.

Before digging in, we keep in mind our standard of review. "[W]e assess 'whether substantial evidence supports the Board's factual findings and whether legal conclusions have a reasonable basis in law.'" *Mondelez Glob., LLC v. N.L.R.B.*, 5 F.4th 759, 768–69 (7th Cir. 2021) (quoting *Constellation Brands U.S. Operations, Inc. v. N.L.R.B.*, 992 F.3d 642, 646 (7th Cir. 2021)). That standard "is not arduous." *N.L.R.B. v. Jam Prods., Ltd.*, 66 F.4th 654, 668 (7th Cir. 2023). Our review of the Board's decisions is deferential and "circumscribed." *SCA Tissue N.A. LLC v. N.L.R.B.*, 371 F.3d 983, 987 (7th Cir. 2004).

For factual findings, we examine the "existing administrative record," *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019), looking to "such relevant evidence that a reasonable mind might accept as adequate to support the conclusions of the Board." *N.L.R.B. v. Teamsters Gen. Local Union No. 200*, 723 F.3d 778, 783 (7th Cir. 2013) (internal quotation marks omitted). Taking that look, we do not flirt with fact-finding or quibble with the Board's reasonable conclusions as we would on de novo review. *See SCA Tissue*, 371 F.3d at 988; *see also Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951). Additionally, we do not question an agency's credibility determinations, and we "disturb [them] only in extraordinary circumstances." *N.L.R.B. v. KSM Indus., Inc.*, 682 F.3d 537, 544 (7th Cir. 2012) (internal quotation marks omitted). It is not our place to "reweigh the evidence, and the presence of contrary evidence does not compel us to reverse the Board's order." *Jam Prods.*,

66 F.4th at 668 (cleaned up). "Where … the Board adopts the ALJ's findings of fact and conclusions of law, our review focuses on the ALJ's order." *Constellation Brands*, 992 F.3d at 646.

For legal conclusions, our scrutiny of the Board's decision is deferential out of respect for Congress's broad delegation of responsibility for developing national labor policy to the Board. *See N.L.R.B. v. Erie Brush & Mfg. Corp.*, 406 F.3d 795, 801 (7th Cir. 2005). Therefore, "we accept the Board's legal conclusions unless they are irrational or inconsistent with the Act." *Jam Prods.*, 66 F.4th at 669 (cleaned up).

**A**

First up is the Board's conclusion that RiverStone's denial of Matt Kelly's request for the presence of Local 150 steward Lyle Calkins at his investigatory interview violated Section 8(a)(1) of the Act.

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection … ." 29 U.S.C. § 157. It is "an unfair labor practice for an employer to interfere with, restrain, or coerce employees" in the exercise of those rights. *Id.* § 158(a)(1) (Section 8(a)(1)).

The Board has held, and the Supreme Court has affirmed, that union employees have the right under § 157 to the presence of a union representative at investigatory interviews that could lead to the employee's discipline. *N.L.R.B. v. Weingarten*, 420 U.S. 251, 260–61 (1975). An employer violates an employee's *Weingarten* rights when the employer refuses the employee's request for a union representative at such an

investigatory interview. *Id.* at 262. Our court has consistently recognized the existence of such a right. *Spurlino Materials, LLC v. N.L.R.B.*, 645 F.3d 870, 881–82 (7th Cir. 2011); *N.L.R.B. v. Ill. Bell Tel. Co.*, 674 F.2d 618, 622 (7th Cir. 1982) ("[A] union employee has a right to the presence of a union officer at an investigatory interview.").

An employer has three options when a union employee requests the presence of a representative. The employer may grant the request, discontinue the interview, or offer a choice between continuing the interview without representation or having no interview at all. *Washoe Med. Ctr. Inc.*, 348 N.L.R.B. 361, 367 (2006). The employer also must allow reasonable time for the representative to become available once the employee requests union representation. *Manhattan Beer Distribs. LLC*, 362 N.L.R.B. 1731, 1732 (2005).

Substantial evidence supports the Board's conclusion that RiverStone violated the Act when it denied Matt Kelly's request for the presence of Lyle Calkins. The Board recognized the facts discussed above: Kelly was summoned for an investigatory interview; Kelly asked for Calkins' presence; Skerston denied the request because Calkins was 25 minutes away but offered the presence of another employee with no union leadership position; that employee also asked for Calkins when he arrived; and Skerston and Becker continued the interview without Calkins, culminating in Kelly's suspension and termination. The Board noted that this record showed RiverStone failed to comply with any of the three permissible options. Therefore, RiverStone violated Section 8(a)(1) by denying Kelly his *Weingarten* rights.

On appeal, RiverStone neither contests these facts nor argues that they do not amount to a violation of an employee's

rights under the Act. Rather, the company's only argument is the same it raised to the Board—*Weingarten* does not apply to permanent replacement workers. In support, RiverStone offers three rationales: (1) it is a conflict of interest for a union to represent both permanent replacement workers and economic strikers; (2) union representation does not alter the imbalance between employers and replacement workers because employers may unilaterally set the terms and conditions of employment for replacement workers without bargaining; and (3) *Weingarten* rights for replacement workers undermine the benefits provided by workplace investigations. For authority, RiverStone relies on *IBM Corp.*, 341 N.L.R.B. 1288, 1289 (2004) and *E.I. DuPont & Co.*, 289 N.L.R.B. 627, 629–30 (1988), two decisions in which the Board pronounced that unrepresented employees have no right to union representation at an investigatory interview.

Three problems arise with RiverStone's positions. First, as a matter of the record and applicable labor law, both those Board decisions are inapplicable—Kelly was a Local 150 member. Second, RiverStone's analogy of replacement workers as unrepresented employees in a non-union setting is unhelpful. As RiverStone sees it, putting aside the fact that Kelly is a union member, Kelly signed a Notification of Employment with terms different than the expired CBA. So, the company asserts, there is no basis for it to accede to Kelly's request for representation at an interview regarding matters over which the union possessed no bargaining rights. But, as the Board recognized, *Weingarten* rights are rooted in statute and personal to the union employee, *see* 420 U.S. at 260–61. Those rights are not a term and condition of employment about which an employer and union may bargain. Third, the Board provided adequate legal support for rejecting RiverStone's

contention that strikers and replacement workers lack common interests that require denying *Weingarten* rights to replacement workers. "[R]eplacements may in some circumstances desire union representation despite their willingness to cross the picket line." *N.L.R.B. v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 789 (1990). That is, they are "capable of looking past the strike in considering whether or not they desire representation by the union." *Id.* at 792.

Substantial evidence supports the Board's conclusion, which is rationally based in the law. Kelly was a union-represented employee who asked for the presence of a union representative at his investigatory interview. RiverStone's refusal without selecting any of the other lawful options was contrary to Kelly's rights and violated Section 8(a)(1).

**B**

Next up is Local 150's assertion that Kelly's discipline and ultimate discharge violated Sections 8(a)(1) and (a)(3) of the Act. Section 8(a)(3) prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment … to discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). Simplified, it is unlawful to discipline an employee because of his union activity. *N.L.R.B. v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401 (1983), *abrogated on other grounds in Director, Off. of Workers' Comp. Program, Dept. of Labor v. Greenwich Collieries*, 512 U.S. 267 (1994). When an employer violates Section 8(a)(3), it also violates Section 8(a)(1). *Metro. Edison Co. v. N.L.R.B.*, 460 U.S. 693, 698 n.4 (1983).

"We apply the two-part *Wright Line* burden shifting framework to examine an employer's motivation in discharging a

union member." *Mondelez Glob.*, 5 F.4th at 769 (citations omitted). At step one, "we assess whether the General Counsel [of the Board] 'has shown that antiunion animus was a substantial or motivating factor in the discharge.'" *Id.* (quoting *Big Ridge, Inc. v. N.L.R.B.*, 808 F.3d 705, 713 (7th Cir. 2015)). To satisfy this burden, the General Counsel must show that: "(1) the employee engaged in a protected activity; (2) the decisionmaker knew it; and (3) the employer acted because of antiunion animus." *Id.* (quotation marks omitted). "[T]he evidence must be sufficient to establish that a causal relationship exists between the employee's protected activity and the employer's adverse action against the employee." *Id.* (citation omitted).

If the General Counsel meets the step one burden, we go to step two—the burden shifts to the employer to show that it would have discharged the employee even "in the absence of protected conduct." *Wright Line*, 251 N.L.R.B. 1083, 1089 (1980); *see Mondelez Glob.*, 5 F.4th at 769. "At either step of *Wright Line*, the Board may infer discriminatory motive based on direct or circumstantial evidence." *Mondelez Glob.*, 5 F.4th at 770 (citing *Loparex LLC v. N.L.R.B.*, 591 F.3d 540, 546 (7th Cir. 2009)).

The Board's conclusion that RiverStone did not violate Sections 8(a)(1) and 8(a)(3) by disciplining and discharging Kelly is supported by substantial evidence and rationally based in the law. The Board assumed, as the ALJ found, that the General Counsel met its burden at step one. But the Board disagreed with the ALJ's finding that RiverStone could not meet its burden to show it would have disciplined and discharged Kelly absent his union activity. That was because between May 2 to August 14 of 2019, Kelly committed eight

different infractions, including four attendance infractions (on May 2, May 8, August 7, and August 14), and four performance or safety infractions (two on May 7, one on May 9, and one on July 10). Moreover, RiverStone disciplined Kelly for these infractions consistent with its progressive discipline policy, ultimately discharging him for the four attendance infractions. Though the ALJ and dissenting Board panelist disagreed, the Board highlighted the record evidence showing that RiverStone, through Skerston, "counseled Kelly … on the spot or shortly thereafter," making it safe to conclude "that Kelly was aware of, and repeatedly counseled about, his numerous … infractions."

To counter the Board's decision, Local 150 asserts that RiverStone's stated reason for Kelly's discipline and discharge—the four attendance infractions—is pretextual. Proof of pretext, the union asserts, is in the "suspicious timing of the adverse actions; RiverStone's failure to follow its disciplinary policies; RiverStone's acceptance of similar behavior from other employees; the shifting defenses; [and] the failure to provide the discipline [warnings] to Kelly."

The Board sufficiently addressed these contentions, and its conclusion was adequately supported by the applicable law and record evidence. It recognized that an employer's *Wright Line* defense may be doomed where it fails to issue discipline in a timely manner. But in cases supporting that principle, the Board noted, the untimely provision of disciplinary notice was accompanied by other manipulation of the employer's disciplinary policies. Though the Board examined the record for such manipulation here, it found none: RiverStone acted consistent with its disciplinary policy. The company also acted consistent with that policy as to other employees,

disciplining six different employees for twelve different in-fractions—including for safety, attendance, and cell phone use—in the two years prior to Kelly's discharge.

Local 150 cites no authority to support its assertion that the Board erred when it ruled that RiverStone did not act with pretext. Instead, the union asks us to see the record evidence in a different light, as the ALJ did. For example, Local 150 urges us to see evidence of manipulation in RiverStone's fail-ure to issue the first two disciplinary notices until August 2019 and in RiverStone meting out most of its discipline after Kelly revealed his union support. But the Board considered all this and decided that the failure to issue the notices was not pre-textual as RiverStone informed and counseled Kelly about his repeated infractions. Nor could the timing display pretextual action where RiverStone disciplined Kelly and other employ-ees in a similar manner for similar violations.

The same is true of Local 150's assertion that RiverStone "shifted defenses" in its explanation for Kelly's discharge. The Board found "that [RiverStone] consistently asserted that it discharged Kelly under its progressive discipline policy for his multiple, undisputed attendance infractions." Local 150 argues the Board improperly considered the other infractions, but the Board was clear, after its review of the record, that RiverStone terminated Kelly based on the attendance infrac-tions.

At bottom, Local 150 asks us to reweigh the evidence, which we cannot do. Additionally, Local 150 points to no con-trary law. So, we hold that the Board did not err in concluding that RiverStone's discipline and discharge of Kelly was law-ful.

## C

We turn now to the Board's conclusion that RiverStone violated Section 8(a)(1) by requiring Joe Ellena to sign a preferential hiring list after he submitted his unconditional offer to return to work.

An individual who strikes remains an employee so long as he does not "obtain[] regular and substantially equivalent employment." *N.L.R.B. v. Fleetwood Trailer Co.*, 389 U.S. 375, 378 (1967). An employer's refusal to reinstate strikers constitutes an unfair labor practice, "unless the employer who refuses to reinstate strikers can show that his action was due to 'legitimate and substantial business justifications.'" *Id.* (quoting *N.L.R.B. v. Great Dane Trailers*, 388 U.S. 26, 34 (1967)); *see Laidlaw Corp.*, 171 N.L.R.B. 1366, 1368–69 (1968) (discussing *Fleetwood Trailer*). *Laidlaw* requires employers, upon an employee's unconditional offer to return to work, to reinstate the employee "or, if no vacancy then exist[s], to place them on a nondiscriminatory recall list until a vacancy occur[s]." *Peerless Pump Co.*, 345 N.L.R.B. 371, 375 (2005). An employer violates *Laidlaw* when it imposes any further affirmative obligation on the employee, unless legitimate and substantial business justifications exist to support such an imposition. *Id.*; *Giddings & Lewis, Inc. v. N.L.R.B.*, 710 F.2d 1280, 1286–88 (7th Cir. 1983) (denying enforcement of Board order where legitimate business justification supported employer's requirement that formerly striking employees provide periodic notice of their intent to remain on preferential hiring list).

The Board has previously ruled that requiring former strikers to come to the workplace to sign a preferential hiring list unlawfully infringes on those employees' *Laidlaw* rights. *Peerless Pump Co.*, 345 N.L.R.B. at 375. There, the employer

responded to a union's unconditional offer to return to work with a letter requesting that employees "come to the plant and sign the preferential rehire list." *Id.* at 372. The employer's asserted business justification was that the list served to identify the individuals who remained available and interested in recall and to compile contact information. *Id.* "By requiring former strikers to take steps beyond their unconditional offer to return to work, the [employer] interfered with their unrelinquished right to be recalled to work upon the conclusion of the strike." *Id.* at 375. So, the employer interfered with the employees' *Laidlaw* rights "by initially establishing and announcing a signup requirement," and violated Sections 8(a)(3) and (a)(1) of the Act. *Id.*

The ALJ concluded that Riverstone violated the Act when it required Ellena—after he made his unconditional offer to return to work—to come to Vermillion Quarry and sign a preferential hiring list. The Board agreed, and substantial evidence supports that conclusion. When Ellena made his offer, RiverStone was unequivocal: "There are no job openings at this time. The Company has established a preferential hiring list which you are welcome to sign if you wish to do so. The preferential hiring list is located at Vermillion." The "import of this statement," the ALJ found, "was that, in the absence of job openings, Ellena should get his name on the list in order to be recalled." The list was unambiguous too, stating, "By signing this list, you unconditionally offer to return to work at Troy Grove Quarry/Vermillion Quarry, divisions of RiverStone Group, Inc."

But Ellena had already provided his offer to return to work. And RiverStone proffered no legitimate business justification for this additional obligation. The ALJ thus properly

found that requiring Ellena to complete additional paper-
work at the Vermillion Quarry violated Sections 8(a)(3) and
(a)(1) of the Act.

RiverStone raises two counter arguments. First, it con-
tends "[t]he preferential hiring list did not negatively affect
Ellena" because he was the only employee seeking a return to
work. That fact, RiverStone argues, distinguishes the matter
from *Peerless Pump*, where a large number of former strikers
sought reinstatement. But neither an employee's *Laidlaw*
rights nor the application of *Peerless Pump* hinges on the num-
ber of workers seeking a return to work. The Board was clear
in *Peerless Pump*: the "imposition of an affirmative obligation
on former strikers to come to the plant to sign the list itself is
an unlawful infringement" on an employee's *Laidlaw* rights,
"absent a legitimate and substantial business justification."
345 N.L.R.B. at 375. RiverStone points to no precedent or
Board decision supporting this numerical argument.

Second, RiverStone argues that the ALJ erred in finding
that the company committed Section 8(a)(3) discrimination by
imposing the signing obligation on Ellena. But recall, *supra*
note 3, the Board found it unnecessary to address the ALJ's
Section 8(a)(3) determination because "doing so would not af-
fect the remedy" and concluded only that RiverStone violated
Section 8(a)(1). Section 8(a)(1) is violated by "[e]mployer con-
duct that reasonably tends to interfere with, restrain, or coerce
employees in the free exercise of their protected rights."
*Contemp. Cars, Inc. v. N.L.R.B.*, 814 F.3d 859, 869 (7th Cir. 2016)
(quotation marks omitted); 29 U.S.C. § 158(a)(1). No discrimi-
nation is necessary, unlike Section 8(a)(3) violations. *See* 29
U.S.C. § 158(a)(3) (it is an unfair labor practice for an employer
"by discrimination in regard to hire … to encourage or

discourage membership in any labor organization."). Contrary to RiverStone's assertion, it does not matter that "Ellena was not treated less favorably than other employees who have offered to return to work when there were no vacancies because there are no such other employees." What matters is that RiverStone imposed an additional obligation on Ellena without a legitimate and substantial business justification. Such action violates the Act, as the Board concluded.

## D

Next, we review whether the Board correctly decided that RiverStone violated Section 8(a)(1) by removing a Local 150 picket sign from public property. An employer who removes, or causes the removal of, picket signs violates Section 8(a)(1) because such conduct "impermissibly interfere[s] with the Section 7 rights of [] employees to place picket signs in support of the strike." *St. Louis Auto Parts Co.*, 315 N.L.R.B. 717, 720 (1994); *Fla. Wire & Cable, Inc.*, 333 N.L.R.B. 378, 382 (2001) ("Confiscation of picket signs, like outright prohibition of picketing, deprives employees of their Section 7 rights.").

The Board concluded that RiverStone violated Section 8(a)(1) when RiverStone's "persuader" James Misercola removed a Local 150 picket sign. We see substantial evidence in the administrative record of the theft. Two strikers testified they saw Misercola drive by the sign and shortly thereafter, the sign was gone. Misercola testified he did not take it. The ALJ did not err in crediting the testimony of those two strikers and discrediting Misercola because of his "general and hedging denial."

RiverStone does not directly challenge the Board's agreement with the ALJ on this point. Instead, it takes issue with

the ALJ's determination that RiverStone's employment of Misercola is proof of animus towards the union. To River-Stone, the animus conclusion taints the ALJ's finding about the picket sign. But the animus conclusion did not follow from the ALJ's examination of the removed picket sign. Rather, it went to the ALJ's step one inquiry to evaluate whether Matt Kelly's union activity was a motivating factor in his discharge under *Wright Line*. The Board's discussion of Matt Kelly's discharge did not adopt this particular finding of the ALJ. Instead, the Board assumed the General Counsel met its burden under *Wright Line* step one and decided the question solely on step two.

RiverStone essentially asks us to reconsider the ALJ's credibility findings. But we owe those determinations "great deference" in the absence of "extraordinary circumstances." *Mondelez Glob.*, 5 F.4th at 769. Though not characterized as such, RiverStone offers one possible extraordinary circumstance—that the ALJ's reasoning runs headlong into Section 8(c) of the Act. That provision states:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c). As RiverStone points out, Section 8(c) codifies the protection of noncoercive employer speech to employees. *See N.L.R.B. v. Gissel Packing*, 395 U.S. 575, 617 (1969). Part of that noncoercive speech is the ability to hire

"persuaders" like Misercola to communicate RiverStone's positions regarding union activity and elections.

But RiverStone misses the point. First, neither the ALJ nor the Board acted contrary to RiverStone's Section 8(c) rights by finding that it violated the Act through Misercola's removal of a sign. Though hiring Misercola as a "persuader" is a protected employer activity, Misercola's removal of a picket sign is not. *See St. Louis Autoparts Co.*, 315 N.L.R.B. at 720. Second, the ALJ's credibility conclusion as to Misercola was not anchored to any determination regarding antiunion animus. Instead, the ALJ found Misercola's testimony to be "equivocal and indirect," as evidenced by his "refus[al] to answer even [the] most basic questions," his "quibbl[ing] with the Union's counsel on cross-examination," and "his limited recall of the events at issue." It was reasonable for the ALJ to make this call, and we do not question it.

## E

RiverStone's last challenge is to the Board's decision that the Company violated Sections 8(a)(5) and (a)(1) of the Act by implementing a new punch-in policy without first notifying the union or offering the opportunity to bargain. Local 150 also disputes the Board's conclusion that the violation does not extend to replacement workers.

## 1

Section 8(a)(5) makes it an unfair labor practice "to refuse to bargain collectively with the representatives of [] employees." 29 U.S.C. § 158(a)(5). "As part of this duty to bargain, an employer must maintain the status quo after the expiration of a collective bargaining agreement until a new agreement is reached or until the parties bargain in good faith to impasse."

*RiverStone Grp., Inc. v. Midwest Operating Eng'rs Fringe Benefit Funds*, 33 F.4th 424, 429 (7th Cir. 2022) (quotation marks omitted). RiverStone and the Board agree, "[a]n employer violates Section 8(a)(5) and (1) if it makes a material, substantial, and significant change regarding a mandatory subject of bargaining without first providing the union notice and a meaningful opportunity to bargain about the change to agreement or impasse, absent a valid defense." *MV Transp., Inc.*, 368 N.L.R.B. No. 66, slip op. at 3 (Sept. 10, 2019) (citing *N.L.R.B. v. Katz*, 369 U.S. 736, 747 (1962)). Those mandatory subjects "includ[e] 'wages, hours, and other terms and conditions of employment.'" *Mondelez Glob.*, 5 F.4th at 772 (citation omitted). In fact, Section 8(a)(5) extends to an employer's "regular and longstanding" practices that are neither "random" nor "intermittent." *Sunoco, Inc.*, 349 N.L.R.B. 240, 244 (2007).

We hold that substantial evidence supports the Board's conclusion that RiverStone violated Sections 8(a)(5) and (a)(1) when it began requiring that employees punch in no earlier than five minutes before a scheduled shift start without notifying Local 150 or offering the opportunity to bargain. The expired collective bargaining agreement did not discuss early punch-ins. It only provided that "[s]tarting time is optional upon mutual agreement of employees and Employer," and that if RiverStone elected a work week of "four (4) days at ten (10) hours … overtime [would] be paid after ten (10) hours in any one work day." However, it was a "regular and longstanding practice" for RiverStone to permit early punch-ins. Numerous employees punched in up to 25 minutes before shift start times, with at least one having done so since 2001. Some employees did this "every day." RiverStone was aware of this practice. When it posted the January 2019 punch-in

notice, RiverStone did so without notifying the union or offering the chance to bargain. So, RiverStone violated the Act.

RiverStone offers two rejoinders. First, it argues the January 2019 notice was not a change in policy requiring notice or the opportunity to bargain. Rather, it was just an act to enforce the existing and agreed upon work schedule contained in the expired CBA.

This first argument ignores the record, which shows that it was a longstanding and permissible practice for employees at the quarries to punch in up to 25 minutes before a scheduled shift start. A change to that practice therefore required notice and an opportunity to bargain. The failure to provide as much breached the Act.

Second, RiverStone asserts that the January 2019 notice was not unlawful because it "was not a material, substantial, and significant change." The Board rejected this same challenge raised previously before it, concluding that schedule changes, like the change to the punch-in policy here, constitute material changes. *See, e.g.*, *Pepsi-Cola Bottling Co. of Fayetteville*, 330 N.L.R.B. 900, 902 (2000). RiverStone again urges that it did not enact a new punch-in policy but only enforced the existing one. Therefore, RiverStone's actions distinguish it from employer actions at issue in decisions like *Pepsi-Cola*.

This second argument does not sufficiently address materiality. As explained above, the January 2019 punch-in notice constituted a detour from a practice RiverStone long tolerated. RiverStone's attempt to characterize the January 2019 notice as an enforcement action to avoid the applicability of prior Board decisions is unconvincing. Moreover, RiverStone's own briefing reveals the material nature of the

change. The mining company recognizes that "[e]arly punch-ins are problematic … because … they result in unscheduled, unauthorized overtime paid at time-and-a-half." Put another way, early punch-ins increase RiverStone's overhead because it must then compensate employees for overtime. Just as the unilateral change to the punch-in practice significantly affects RiverStone's costs, it significantly affects the corresponding benefit to the employees.

In sum, RiverStone's January 2019 notice constituted a material change to a longstanding practice that affected the wages and hours of its employees. Because RiverStone offered neither notice nor the opportunity to bargain, it violated Sections 8(a)(5) and (a)(1) of the Act.

### 2

Local 150 also challenges the Board's punch-in policy finding. Recall, the Board declined to extend this violation to strike replacements. That decision, Local 150 says, has no reasonable basis in the law.

As a preliminary matter, the Board asserts that Local 150 waived this argument. The Board faults the union for failing to assert anything more in its answering brief before the Board than a statement that "the [January 2019 Notice] applied to all workers." The Board also argued that once it issued its decision, Local 150 waived its argument by failing to file a motion for reconsideration.

We cannot consider any "objection that has not been urged before the Board, its member, agent, or agency." 29 U.S.C. § 160(e). "[A] party which fails to raise an exception before the Board is jurisdictionally barred from raising that exception in

an enforcement proceeding before the court of appeals." *N.L.R.B. v. Howard Immel, Inc.*, 102 F.3d 948, 951 (7th Cir. 1996).

But Local 150 did not waive its argument. This circuit has recognized that "Section [160(e)] operates to ensure that the Board has a chance to review any issues that may arise in a subsequent review of its decision" so that the Board can consider the merits of an issue. *Howard Immel*, 102 F.3d at 951. RiverStone raised in its exceptions to the Board that the ALJ incorrectly found that the violation extended to replacement workers. Local 150 touched on this argument in its answering brief. And the Board was able to address the merits of River-Stone's exception. As for the Board's assertion that Local 150 should have filed a petition for reconsideration, this court has rejected the notion that such action is necessary. *Local 65-B, Graphic Comms. Conf. of Int'l Broth. of Teamsters v. N.L.R.B.*, 572 F.3d 342, 349 (7th Cir. 2009) (citing *U.S. Marine Corp v. N.L.R.B.*, 944 F.2d 1305, 1319 n.17 (7th Cir. 1991)).

Turning to the merits, the Board's decision not to extend the punch-in policy violation to replacement workers was based on prior Board decisions. It has previously held that "an employer need not bargain with a union regarding the terms and conditions of employment for strike replacements hired during a strike." Specifically, the Board looked to its decision in *Detroit Newspaper Agency*, 327 N.L.R.B. 871 (1999). Two "major reasons" buttress that holding: (1) employers have a right to hire replacements, and in a strike situation where "the employer does not have the luxury of postponing the hiring for that indefinite period," imposing a duty to bargain would nullify that right; and (2) requiring bargaining with strike replacements would sidetrack employer bargaining efforts with the union concerning its striking workers. *Id.*

Local 150 does not dispute *Detroit Newspaper*'s general principle. Instead, it argues that the Board's conclusion "is contrary to policies advanced by the Supreme Court" and "adhere[s] to the myth that there exists a conflict of interest between representing strikers and their replacements." We disagree. Both the Board and the courts have recognized that replacement workers become part of the bargaining unit when hired, obligating unions to represent both those workers and strikers. *See Capitol-Husting Co., Inc. v. N.L.R.B.*, 671 F.2d 237, 247 (7th Cir. 1982). Necessarily then, the interests of strikers and striker replacements are not always in conflict. *See Curtin Matheson Sci., Inc.*, 494 U.S. at 790–91 (upholding the Board's decision to not adopt a presumption that strike replacements oppose the union). Simultaneously though, the Supreme Court is unpersuaded that such a theory—that there is no conflict between represented strikers and represented replacement workers—"is irreconcilable with the Board's decisions holding that employers have no duty to bargain with a striking union over replacements' employment terms." *Id.* at 790.

Local 150 requests us to heed the conclusion in *Curtin Matheson*: "Because the circumstances of each strike and the leverage of each union will vary greatly, it was not irrational for the Board to reject the antiunion presumption and adopt a case-by-case approach in determining replacements' union sentiments." *Id.* at 791. This strikes us as a call to reweigh the evidence. While certainly permissible for the Board to apply a case-by-case approach, it is not our place to usurp the Board's conclusion by reweighing the evidence. *See Jam Prods.*, 66 F.4th at 668.

The union also asserts that the existence of other rights—such as *Weingarten* rights—held by replacement workers indicates that RiverStone's violation must extend to replacement workers as well. But the Board recognizes "that the ability to set employment terms for replacements is a necessary incident of the very right to hire them in the first place." *Serv. Elec. Co.*, 281 N.L.R.B. 633, 641 (1986)

Local 150 also contends that the Board's conclusion was error because it extended overtime opportunities to striker replacements not available to other employees, relying on *N.L.R.B. v. Great Dane Trailers, Inc.*, 388 U.S. 26 (1967). In *Great Dane*, the Supreme Court reasoned that "[t]he act of paying accrued benefits to one group of employees while announcing the extinction of the same benefits for another group of employees who are distinguishable only by their participation in protected concerted activity surely may have a discouraging effect on either present or future concerted activity." *Id.* at 32. But *Great Dane* concerned Section 8(a)(3) discrimination violations, not bargaining violations under Section 8(a)(5) relevant to the unilateral punch-in policy change.

Substantial evidence supports the Board's decision that RiverStone violated Sections 8(a)(5) and (a)(1) by unilaterally implementing a new punch-in policy, and that such a violation did not extend to replacement workers was reasonably based in the law.

\*        \*        \*

One last matter requires our attention. Before oral argument, Local 150 moved for sanctions against the Board and its counsel, arguing that the Board's waiver argument (discussed

above) is impermissibly frivolous. The union's motion relies on Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927.

Sanctions are not warranted here. As a reminder, because "this court has not incorporated Rule 11 into its own rules, … the rule does not apply directly to proceedings in this court." *Hill v. Norfolk and W. Ry. Co.*, 814 F.2d 1192, 1200 (7th Cir. 1987); *see also* FED. R. CIV. P. 1 ("These rules govern the procedure in all civil actions and proceedings in the United States district courts."). Rule 11 does provide guidance in our interpretation of similar rules that are applicable to appellate proceedings, like 28 U.S.C. § 1927. *Hill*, 814 F.2d at 1200. So "we look to principles that have evolved in the interpretation of Rule 11." *Sparks v. N.L.R.B.*, 835 F.2d 705, 707 (7th Cir. 1987).

"Rule 11(b) requires attorneys to certify to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, that their filings have adequate foundation in fact and law and lack an improper purpose." *Mullen v. Butler*, 91 F.4th 1243, 1254 (7th Cir. 2024) (quotation marks omitted). Motions under Rule 11 should not "be prepared to emphasize the merits of a party's position" or "to intimidate an adversary into withdrawing contentions that are fairly debatable." FED. R. CIV. P. 11(b) advisory committee's note to 1993 amendment.

Section 1927 opens litigants up to liability for the costs and fees of conduct that "so multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. That statute "permits courts to levy sanctions against an attorney … if the attorney has 'acted in an objectively unreasonable manner by engaging in a serious and studied disregard for the orderly process of justice' or where a claim is 'without a plausible

legal or factual basis and lacking in justification.'" *Mullen*, 91 F.4th at 1254 (7th Cir. 2024) (quoting *Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 708 (7th Cir. 2014)).

Neither the Board nor its counsel have acted in such an egregious manner. The Board's waiver argument had a plausible (though unsuccessful) legal and factual basis. Disagreement with the Board's position is not sanctionable.

### III

Substantial evidence supports the Board's conclusions, all of which were reasonably based in substantive labor law. Therefore, we DENY both RiverStone and Local 150's petitions for review and GRANT the Board's cross-application for enforcement. Additionally, we DENY Local 150's motion for sanctions.