# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 10-2875 & 10-3049

SPURLINO MATERIALS, LLC,

*Petitioner, Cross-Respondent,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent, Cross-Petitioner,*

and

COAL, ICE, BUILDING MATERIAL, SUPPLY DRIVERS,
RIGGERS, HEAVY HAULERS, WAREHOUSEMEN AND
HELPERS LOCAL UNION NO. 716, A/W INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, CHAUFFEURS,
WAREHOUSEMEN AND HELPERS OF AMERICA,

*Intervening Respondent, Cross-Petitioner.*

Petition for Review and Cross-Application
for Enforcement of Order of the
National Labor Relations Board.
NLRB Case Nos. 25-CA-30053; 25-CA-30054; 25-CA-30080;
25-CA-30104; 25-CA-30156; 25-CA-30179 & 25-CA-30362

ARGUED JANUARY 11, 2011—DECIDED JUNE 23, 2011

Before EASTERBROOK, *Chief Judge*, and CUDAHY and POSNER, *Circuit Judges*.

CUDAHY, *Circuit Judge*. Here, the National Labor Relations Board (Board) applies for enforcement of its order against cross-petitioner Spurlino Materials, LLC (Spurlino),[1] which found Spurlino to have engaged in a variety of unfair labor practices and imposed remedial measures. The relevant Union intervenes on behalf of the NLRB. Spurlino's petition consists mainly of a reprise of factual arguments that did not persuade the Board. Consistent with the deferential standard of review accorded the Board's ruling, we grant the application for enforcement.

## I. Background

### A. Facts

Spurlino is a construction materials supplier doing business in several states including Indiana. This case arises from events at the company's concrete distribution center on Kentucky Avenue in Indianapolis, which is a base of operations for approximately fifteen concrete truck drivers. The relevant facts consist of various discrete episodes of hostility on the part of Spurlino managers toward the Kentucky Avenue employees'

---

[1] Spurlino Materials was majority-owned by Jim Spurlino at the time relevant to this case. "Spurlino" will refer to the company, and the company owner will be indicated by his full name.

efforts to unionize, and toward individual truckers who conspicuously supported the Union.

In 2005 a number of the Kentucky Avenue truckers began an effort to unionize. In January of 2006 the Kentucky Avenue truckers elected to be represented by the Coal, Ice, Building Material and Supply Drivers, Riggers, Heavy Haulers, Warehousemen, and Helpers Local Union No. 716 (Union). Truck drivers Matthew Bales, Ron Eversole and Gary Stevenson were vocal supporters of the Union at the Kentucky Avenue center. All three served on the Union's organizing committee and as election observers, and after the Union was certified they served on its bargaining committee.

The company's established practice was to dispatch the Kentucky Avenue concrete truckers in order of seniority, such that earlier-hired truckers were the first dispatched and had the first opportunity to earn pay for deliveries.[2] Of fifteen truckers, Eversole was first in seniority, and Stevenson and Bales were fourth and fifth, respectively.

In February of 2006, Spurlino began supplying concrete for the construction of what is now the Lucas Oil Stadium,[3] pursuant to a Project Labor Agreement (PLA). The PLA

---

[2] The precise contours of the relationship between deliveries and pay are not clear from the record. But it is clear, and sufficient for our purposes, that deliveries were a principal determinant (and possibly the sole determinant) of trucker pay.

[3] The stadium, completed in 2008, is home to the NFL's Colts football team and seats over 60,000 spectators.

bound Spurlino and the instant Union as well as many other companies and unions involved in building the stadium. The stadium project paid Spurlino's truckers a special, higher hourly wage.

Spurlino did not initially follow its regular seniority practice when dispatching its Kentucky Avenue truckers to the lucrative stadium project. Instead, in early dispatches to the stadium project (a period from February 16 to March 24, 2006), Spurlino routinely dispatched several more junior truckers bypassing Eversole, Stevenson and Bales. At the end of that period, the records as credited by the administrative law judge (ALJ) indicated a return (more or less) to the regular seniority order.

In May of 2006, Spurlino established a temporary plant near the stadium construction site. The company determined to staff this temporary plant with four truckers from the Kentucky Avenue center ("portable plant drivers"). Under the company's plan, these "portable plant drivers" would work at the portable plant unless they were not needed there, in which case they would work from the Kentucky Avenue facility but would be dispatched last (i.e., they would lose their seniority on the Kentucky Avenue dispatch list). The company did not bargain with the Union in connection with the creation of this new portable plant role. Instead, the company posted a notice at the Kentucky Avenue facility of the new position seeking volunteers for the position. The company informed the Union about its solicitation of volunteers for the position on the same day. Despite the loss of seniority, the portable plant driver position

was an attractive opportunity, and thirteen of the fifteen Kentucky Avenue drivers volunteered.

The company purported to use a formal evaluation process to select the four portable plant drivers. The process included a test of proficiency with driving rear-discharge trucks, the type in use at the stadium project. Bales, Eversole and Stevenson each volunteered for the position, but the company did not invite Bales or Eversole to take the driving test and did not select Stevenson despite his proficient test performance. In contrast, Spurlino selected one driver who refused to take the test and another whose performance was incompetent.

Later, the company created an "alternate portable plant driver" position for days when the stadium project required more concrete than the four regular portable plan drivers could deliver. Unlike the regular portable plant drivers, these alternates were allowed to retain their seniority at the Kentucky Avenue facility. Spurlino did not notify or bargain with the Union in advance over the creation of this additional position, nor did it offer the alternate position to Bales, Eversole or Stevenson.

In August of 2006 a discrete issue arose involving only Stevenson. Spurlino, adjusting to the need, arising from Union recognition, to account for Union dues in employee paychecks, neglected to redact employee social security numbers from certain deduction-related information circulated together with the current period's paycheck. This practice evidently resulted in the circulation of

the affected employees' social security numbers to much or all of the Kentucky Avenue staff. After realizing the mistake, the company sought to retrieve the cards, and another employee approached Stevenson and asked him to return his copy. Stevenson told him, falsely, that he had thrown it away. He was summoned to the office of Spurlino operations manager Jeff Davidson. Stevenson asked if he could contact his union representative to find out if he had to return the papers, but Davidson continued questioning him. Ultimately, Stevenson drew the papers from his pocket and returned them to the supervisor. The company suspended Stevenson the next day, and fired him about six months later.

In October of 2006, Spurlino secured a contract to supply concrete for a large warehouse project in Plainfield, Indiana. Instead of using its existing employees and making new hires to accommodate the large project, Spurlino hired subcontractors and used Spurlino employees from Ohio who were not part of the Kentucky Avenue bargaining unit. After reaching an agreement with the subcontractors, Spurlino informed the Union of the arrangement. The Union's attorney objected to the unilateral decision to hire outside subcontractors, and insisted that the company was required to bargain with the Union. The company refused to reconsider.

## B. Procedural History

The Union filed charges involving a number of matters with the NLRB General Counsel, who issued a complaint against Spurlino. In December of 2007, an ALJ ruled in

favor of the Union on numerous grounds. In so doing, the ALJ found testimony by several of Spurlino's witnesses, including majority owner Jim Spurlino, general manager Gary Matney and operations manager Jeff Davidson, to be lacking in credibility. On the other hand, the ALJ credited the testimony of five Spurlino drivers that Matney made anti-union statements around the time of the election. The ALJ further credited testimony that Matney engaged in a campaign to dissuade the employees from unionizing and made statements to the effect that the employees would lose desirable benefits or be fired for unionizing and that the company would intentionally prolong union bargaining. The ALJ credited testimony that after the Union election, Matney stated that things would "get uglier than what they were," that the union "makes [him] want to do mean things," and that they would "lose . . . bonuses and more money and vacations and stuff like that . . . ." The ALJ issued an order finding the company to have engaged in several unfair labor practices and imposing several remedial sanctions.

Both parties filed exceptions to the ALJ's decision, and in March of 2009, a two-member panel of the NLRB issued an order affirming the ALJ's decision, with only one notable modification.[4]

---

[4] Before the ALJ, the company had argued that it did not deviate from the seniority list with respect to the stadium project. The ALJ disbelieved this factual contention, but nevertheless concluded that the company's reason for deviating

(continued...)

The NLRB applied for enforcement of its order with this court. But before the case could be set for argument, the Supreme Court decided *New Process Steel, L.P. v. N.L.R.B.*, 130 S. Ct. 2635 (2010), which held that a two-member panel of the NLRB could not properly exercise the Board's authority; three members were required. *Id.* at 2644-45. The NLRB filed an unopposed motion to remand, which this court granted. In August 2010, a three-member panel of the Board adopted the reasoning of the prior two-member panel and issued the order presently before us on application for enforcement. The Board's order in its present iteration would require Spurlino to reinstate Stevenson, to make its pro-union employees whole for losses attributable to its unlawful conduct, to post a remedial notice and to cease and desist from the conduct found to have been unlawful.

## II.  Analysis

This appeal presents the following questions:

1.  Whether the Board was supported by substantial evidence in ruling that Spurlino violated National Labor Relations Act (NLRA) §§ 8(a)(1) and 8(a)(3) by

---

[4] (...continued)
was innocent: the company wanted to feature its newest trucks at the high-profile stadium project. Because this argument was invented by the ALJ and not argued by Spurlino, the Board rejected it, consistent with *Allied Mech. Servs.*, 346 N.L.R.B. 326, 328 n.14 (2006).

failing to dispatch Bales, Eversole and Stevenson to the stadium project in accordance with seniority.

2.  Whether the Board was supported by substantial evidence in ruling that Spurlino violated §§ 8(a)(1) and 8(a)(5) by creating the positions of portable plant driver and portable plant alternate driver, and in implementing a test to fill these positions.

3.  Whether the Board was supported by substantial evidence in ruling that Spurlino violated NLRA §§ 8(a)(1) and 8(a)(3) by failing to select Bales, Eversole and Stevenson as portable plant drivers.

4.  Whether the Board was supported by substantial evidence by ruling that Spurlino violated Gary Stevenson's *Weingarten* rights, and violated NLRA §§ 8(a)(1) and 8(a)(3) by suspending and firing him.

5.  Whether the Board was supported by substantial evidence in ruling that Spurlino violated NLRA §§ 8(a)(1) and 8(a)(5) by assigning warehouse project work to individuals outside the bargaining unit.

We note at the outset that Spurlino's petition for review raises only a few legal arguments against granting enforcement of the Board's order. Otherwise, the company's brief consists of reiterating its own account of the facts. But Spurlino has done nothing to discredit the ALJ's factual findings as adopted by the Board, nor to rehabilitate the company witnesses the ALJ disbelieved. And even if Spurlino's alternative account is plausible, this is insufficient for the company to prevail given the deferential standard of review at this stage of the litigation.

We apply a deferential standard of review to NLRB rulings. Our inquiry is confined to asking whether the Board's factual findings are supported by substantial evidence, and whether its legal conclusions have "a reasonable basis in law." *Local 65-B v. N.L.R.B.*, 572 F.3d 342, 347 (7th Cir. 2009). Moreover, "[w]here, as here, the Board adopted the ALJ's findings of fact and conclusions of law, it is the ALJ's determinations that we review." *Sheehy Enterprizes, Inc. v. N.L.R.B.*, 602 F.3d 839, 843-44 (7th Cir. 2010) (citing *FedEx Freight E., Inc. v. N.L.R.B.*, 431 F.3d 1019, 1026 (7th Cir. 2005)), *reh'g granted*, Nos. 09-1383 & 09-1656, 2010 WL 4069368 (7th Cir. July 21, 2010). We will not upset the ALJ's credibility determinations absent "extraordinary circumstances." *Id.* at 843.

### 1. Spurlino's Deviation from the Seniority System

Substantial evidence supports the Board's conclusion that Spurlino violated NLRA §§ 8(a)(1) and 8(a)(3) by deviating from its regular seniority system in dispatching drivers to the stadium project.

Under § 8(a)(1), it is an unfair labor practice for an employer to "interfere with, restrain, or coerce employees" in connection with their right to organize.[5] Generally, § 8(a)(1) is violated by an action having "a reasonable tendency to interfere with or coerce employees in the exercise of their protected rights." *N.L.R.B. v. Gerig's*

---

[5] The employee right to unionize is set forth in NLRA § 7.

*Dump Trucking, Inc.*, 137 F.3d 936, 940 (7th Cir. 1998) (citation omitted). Under § 8(a)(3), an employer may not discourage unionization "by discrimination in regard to hire or tenure . . . or any term or condition of employment." To establish a violation of § 8(a)(3), the complaining party ordinarily must show that the employer acted with intent to discourage union activity. *See Canteen Corp. v. N.L.R.B.*, 103 F.3d 1355, 1365 (7th Cir. 1997). Circumstantial evidence may be used to demonstrate intent. *See N.L.R.B. v. Shelby Memorial Hosp. Ass'n*, 1 F.3d 550, 568 (7th Cir. 1993). In particular, statements indicating hostility toward pro-union employees in a relevant context may serve as evidence of an anti-union motive. *See N.L.R.B. v. Dorothy Shamrock Coal Co.*, 833 F.2d 1263, 1267 (7th Cir. 1987).

The Board relied on evidence sufficient to show an anti-union motive for purposes of § 8(a)(3): the ALJ concluded that at all times relevant to this appeal, the company had knowledge that Bales, Eversole and Stevenson were active Union supporters. And General Manager Matney's multiple anti-union statements demonstrated an atmosphere of hostility toward the Union. The Board further adopted the ALJ's observation that witness testimony corroborates the departure from seniority and pointed to dispatch ticket records documenting a disparity in seniority-based assignments.

Changing the dispatch order to disfavor union adherents had a "reasonable tendency to interfere" with labor organization under § 8(a)(1), in that it subjected

union sympathizers to economic pressure.[6] It also discriminated against union adherents with respect to compensation, a term or condition of employment, thereby violating § 8(a)(3).[7]

Spurlino contends that the stadium PLA, to which the Union was a signatory, explicitly takes precedence over

---

[6] We emphasize that we affirm the finding of an unfair labor practice only to the extent indicated by the facts described by the ALJ. The Board reversed the ALJ's finding in favor of Spurlino because the ALJ improperly supplied a "new truck" defense for the company. But the Board did not question the ALJ's description of the extent of the departure from seniority, which was less than egregious: Three selected drivers were dispatched ahead of the Union adherents over a period of several months, with the greatest irregularity apparently concentrated around February and March of 2006.

[7] In so holding, we are not deterred by Spurlino's argument, made in a footnote of its brief, that the three dispatchers at the Kentucky Avenue facility controlled the order of dispatch, and that they did not possess anti-union animus for § 8(a)(3) purposes. The ALJ found that the General Counsel had met his initial burden of showing unlawful discrimination against Bales, Eversole and Stevenson with respect to the dispatch order, including by showing an anti-union atmosphere at the Kentucky Avenue facility. The fact that unlawful discrimination may have passed through neutral intermediaries does not necessarily exonerate it. *Cf. Boston Mut. Life Ins. Co. v. N.L.R.B.*, 692 F.2d 169, 171 (1st Cir. 1982) (expressing reluctance "to adopt a rule that would permit the company to launder the 'bad' motives of certain of its supervisors by forwarding a dispassionate report to a neutral superior.").

conflicting provisions of other labor agreements, and explicitly provides that there was no obligation to observe employee seniority at the stadium project. But this argument is unavailing here. Assuming for the moment that the stadium PLA exclusively governed the company's dispatches from the Kentucky Avenue center to the stadium (an uncertain assumption for reasons discussed *infra*), the problem is not simply a departure from the otherwise regular seniority order but the manipulation of the dispatch order specifically as a device to penalize union supporters. Even if the PLA would have authorized Spurlino to dispatch its truckers randomly or alphabetically by last name, it cannot be read to legitimate the unfair labor practices forbidden by § 8(a).

## 2. Creation of Portable Plant Driver and Alternate Driver Positions

Substantial evidence supports the Board's conclusion that Spurlino violated NLRA §§ 8(a)(1) and 8(a)(5) in creating the portable plant driver and alternate driver positions.

Under § 8(a)(5), an employer may not "refuse to bargain collectively with the representatives of his employees." This obligation on the part of the employer arises on the date the union is validly elected. *See Livingston Pipe & Tube, Inc. v. N.L.R.B.*, 987 F.2d 422, 428 (7th Cir. 1993). Mandatory subjects over which the employer must bargain are set forth in § 8(d), and include "wages, hours, and other terms and conditions of em-

ployment." However, "[w]hen a legally cognizable impasse occurs the employer is free to implement changes in employment terms unilaterally . . . ." *Beverly Farm Found., Inc. v. N.L.R.B.*, 144 F.3d 1048, 1052 (7th Cir. 1998) (citation omitted). Typically, a violation of § 8(a)(5) will also amount to a violation of § 8(a)(1), since a refusal to bargain will also interfere with the employees' collective bargaining rights. *See, e.g.*, *Naperville Ready Mix v. N.L.R.B.*, 242 F.3d 744, 755 (7th Cir. 2001).

The Board accepted the ALJ's finding that the portable plant positions were new positions because they involved different pay and benefits, and that their creation affected the wages, hours and other terms and conditions of bargaining unit employees. Therefore, the portable plant positions were the subject of mandatory bargaining under § 8(a)(5).[8]

Spurlino again points to the PLA, arguing that it liberated the company from any obligation to follow seniority or to bargain with the Union when staffing the stadium

---

[8] In any event, we agree with the Board's observation that even if the portable plant assignments were mere "transfers" of unit employees, transfers are ordinarily the subject of mandatory bargaining as well. *See N.L.R.B. v. A-1 King Size Sandwiches, Inc.*, 732 F.2d 872, 877 (11th Cir. 1984) (listing mandatory subjects of bargaining); *Cooper Thermometer Co. v. N.L.R.B.*, 376 F.2d 684, 687-88 (2d Cir. 1967) (employer required to bargain over terms of employee transfers when plant operations are relocated); *Industria Lechera De P.R., Inc.*, 344 N.L.R.B. 1075, 1081 (2005) (concerning a single employee's transfer from night to day shift).

project, including the temporary portable plant (which, again, was established to service the stadium project). This conclusion, according to Spurlino, follows because the PLA removed the affected employees from the Kentucky Avenue bargaining unit and placed them in a stadium project-specific bargaining unit, to which only the terms of the PLA applied. For this proposition, the company refers us to the entire 37-page PLA as well as the entire Construction Agreement, which is a bit shorter.

First, contrary to Spurlino's argument, we see nothing in the PLA or Construction Agreement that expressly establishes an independent bargaining unit the rules of which prevail over existing collective bargaining agreements.[9] Indeed, the PLA leaves most aspects of employer-employee relations to the appropriate existing collective bargaining agreement. Second and more significant, we see nothing in the PLA that purports to eliminate a signatory employer's obligation to bargain with its unit employees over changed terms and conditions of employment. Indeed, § 18.4 of the PLA belies Spurlino's argument that the Union signed away its entitlement to bargaining:

> The parties agree that this Agreement . . . is intended to cover all matters about which the Parties have

---

[9] Moreover, the ALJ's factual discussion suggests that the portable plant truckers were not separated *de facto* from the Kentucky Avenue bargaining unit. In particular, they did not work exclusively at the stadium project, nor was their portable plant assignment permanent.

> desired to negotiate . . . and that . . . neither the Em-
> ployers . . . nor Unions will be required to negotiate
> on any further matters affecting these or any
> other subjects not specifically set forth in this Agree-
> ment . . . . *This section is not intended to relieve any
> Employer of any collective bargaining obligations imposed
> by federal or state law.*

(Emphasis added.) Finally, as the ALJ noted, Spurlino refused to arbitrate the Union's grievance under the procedures established in Article 14 of the PLA. The company thereby denied itself its best opportunity to urge its expansive interpretation of the PLA.

In short, the Board was supported by substantial evidence in rejecting Spurlino's strained PLA-based argument, in concluding that the portable plant drivers remained within the Kentucky Avenue bargaining unit and in holding Spurlino to its obligation to bargain with the Union over the terms and conditions of employment.[10]

We further agree with the Board that Spurlino violated §§ 8(a)(1) and 8(a)(5) in unilaterally implementing employee evaluations to allocate the portable plant driver positions. Establishing a new system of employee evalu-

---

[10] Spurlino also makes a cursory attempt to resurrect the failed factual argument that it bargained to impasse with the Union, but this argument fails.

ations is ordinarily[11] the subject of mandatory bargaining. *See Safeway Stores*, 270 N.L.R.B. 193, 195 (1984). Despite Spurlino's argument to the contrary, the ALJ concluded, and the Board agreed, that the company did not bargain with the Union before implementing a new driving test. Spurlino does not cast doubt on this conclusion by simply reciting its contrary account of the facts.

### 3. Exclusion of Union Supporters from Portable Plant Driver Positions

The Board was supported by substantial evidence in concluding that by excluding Bales, Eversole and Stevenson as portable plant drivers,[12] the company violated NLRA §§ 8(a)(1) and 8(a)(3).

As noted, the ALJ credited testimony tending to show that the company purposely avoided placing Bales, Eversole and Stevenson in the portable plant positions. The Board adopted the ALJ's factual conclusions

---

[11] An exception to this principle exists for evaluation procedures that simply effectuate a "long-existing policy respecting a term of employment . . . ." *N. Kingstown Nursing Care Ctr.*, 244 N.L.R.B. 54, 66 (1979). Spurlino has made no argument that this carve-out applies here.

[12] The Board expressly declined to pass on the ALJ's conclusion that Spurlino had discriminated against Bales, Eversole and Stevenson by failing to make them *alternate* portable plant drivers, noting that this conclusion would not give rise to any additional relief. We likewise do not consider the question.

unmodified. Specifically, the ALJ found that Bales, Eversole and Stevenson all indicated their interest in the portable plant position as did at least ten others. Of the entire group, only Bales and Eversole submitted the written, signed notification of interest that the company had requested. Nevertheless, the company selected four other, newer employees. Jeff Davidson, the company operations manager who made the assignment decisions, testified inconsistently as to the process and criteria used to select for the position. For instance, he stated that rear-discharge truck experience was one criterion, but two of the four drivers selected had absolutely no experience with this type of truck. He stated that performance, including attitude, was a criterion, but two of the drivers selected had performance reviews indicating a poor attitude. He stated that a driving test was an important criterion, but one of the drivers selected refused to take the test, and one performed incompetently. Bales and Eversole were not allowed to take the test, and Stevenson performed well. In sum, the ALJ found Davidson's testimony in defense of the company to have been "laced with inconsistencies, contradicted by driver testimony, and unsupported by any underlying documents or even specifics."

These ALJ factual findings as to the pretextual nature of Spurlino's justifications, together with the evidence of anti-union animus described above, amounted to substantial evidence for the Board to conclude that Spurlino violated §§ 8(a)(1) and 8(a)(3) by excluding Union adherents from a new and better-paid position.

### 4. Gary Stevenson—The *Weingarten* Question and Termination

The matter of Stevenson's termination implicates his *Weingarten* rights, a convention established in *N.L.R.B. v. J. Weingarten, Inc.*, 420 U.S. 251 (1975). In that case, the Supreme Court held that an employer violates § 8(a)(1) by denying an employee union representation upon request during an interview that the employee reasonably believes may lead to disciplinary action. *Id.* at 256-57; *see also Rock-Tenn Co. v. N.L.R.B.*, 69 F.3d 803, 808 n.2 (7th Cir. 1995).

Substantial evidence supports the Board's ruling that Spurlino violated Stevenson's *Weingarten* rights in connection with Stevenson's refusal to return certain errant paperwork. The ALJ found, and the Board accepted, that Stevenson's interview by manager Jeff Davidson was "investigatory" and that Stevenson had an objectively reasonable belief he might be subjected to punishment. The ALJ further credited Stevenson's testimony that he had asked to contact a union representative during the interview with Davidson, but his request was denied. This is sufficient to establish a violation of *Weingarten*. *See N.L.R.B. v. Illinois Bell Tel. Co.*, 674 F.2d 618, 622 (7th Cir. 1982).

The Board was also supported by substantial evidence in concluding that Spurlino violated §§ 8(a)(1) and 8(a)(3) by suspending and terminating Stevenson. The ALJ concluded, and the Board accepted the conclusion, that Stevenson was terminated because of his support for the Union. The ALJ disbelieved the justification Spurlino

offered below and now on appeal: Stevenson was termi-
nated for refusing to cooperate with the company's
efforts to mitigate the unintended publication of em-
ployee social security numbers. The ALJ also noted that
the company witnesses were evasive as to who made
the decisions to suspend and terminate Stevenson, and that
this evasiveness further indicated to the ALJ that their
justifications were pretextual. Retaliating against a pro-
union employee by firing the employee violates § 8(a)(3)
and § 8(a)(1). *See FedEx Freight E., Inc. v. N.L.R.B.*, 431
F.3d 1019, 1025 (7th Cir. 2005) (citing *Vulcan Basement
Waterproofing of Ill., Inc. v. N.L.R.B.*, 219 F.3d 677, 684 (7th
Cir. 2000)).

Here in particular, we rely on our deferential standard
of review. The Board might well have come to a dif-
ferent conclusion, since Stevenson admittedly obstructed
management's efforts to correct what appears to have
been an honest mistake, including by lying to a superior
about discarding his paperwork. One member of the
Board, in fact, noted a similar caveat about his reliance
on the ALJ's factual findings. The ALJ himself acknowl-
edged that Stevenson behaved "imprudently [and] per-
haps childishly," but nevertheless concluded Stevenson's
union support was the cause of his termination.

We, like the Board, properly rely on the ALJ's firsthand
consideration of the evidence. *See Slusher v. N.L.R.B.*, 432
F.3d 715, 727 (7th Cir. 2005) (" '[O]n matters which
the [ALJ], having heard the evidence and seen the wit-
nesses, is best qualified to decide, the agency should be
reluctant to disturb his findings unless error is clearly

shown.'") (quoting *Universal Camera v. N.L.R.B.*, 340 U.S. 474, 494 (1951)). The ALJ's discussions of the credibility of witnesses and of the company's motive in firing Stevenson were extremely thorough and well-reasoned, and together are sufficient support for the Board's conclusion that the company violated §§ 8(a)(1) and 8(a)(3) by firing Stevenson because of his allegiance to the Union.

### 5. Use of Non-Unit Labor for Warehouse Project Work

Substantial evidence supports the NLRB's holding that Spurlino violated NLRA §§ 8(a)(1) and 8(a)(5) by assigning warehouse project work to individuals outside the Kentucky Avenue bargaining unit.

Ordinarily, "the 'contracting out' of . . . work previously performed by members of an existing bargaining unit is a subject about which the [NLRA] requires employers and the representatives of their employees to bargain collectively." *Fibreboard Paper Prods. Corp. v. N.L.R.B.*, 379 U.S. 203, 209 (1964); *see also N.L.R.B. v. Joy Recovery Tech. Corp.*, 134 F.3d 1307, 1315 (7th Cir. 1998).

The ALJ found, and the Board agreed, that Spurlino never offered to bargain over the use of subcontractors. The ALJ further discredited Spurlino's contention that it had a past practice of using non-unit employees from Ohio, and because of Spurlino's non-production of records, concluded that the company's use of non-unit labor for the warehouse project was a change of its business practice. The ALJ believed that this use of subcontractors and non-unit employees, although it did not

result in bargaining unit job losses, stood to affect the terms and conditions of unit employees because they might have enjoyed overtime pay as a result of the project, or alternatively, the project might have resulted in the hiring of additional unit employees. This reasoning was consistent with prior Board precedent in *Acme Die Casting*, 315 N.L.R.B. 202, 207 n.1 (1994). *See also Sociedad Espanola de Auxilio Mutuo y Beneficiencia de P.R. v. N.L.R.B.*, 414 F.3d 158, 166-67 (1st Cir. 2005).

On appeal, Spurlino does not challenge these conclusions, but argues that it was faced with a "sudden business need" to subcontract and asserts that the ALJ recognized this. This is a strained, selective reading of the ALJ's memorandum. The ALJ stated that Spurlino "has never contended the existence of a financial emergency or shown that the use of subcontractors . . . was based on compelling economic reasons," and that Spurlino "would be hard pressed to make such an argument." Two members of the Board also noted that the company had failed to raise the matter of "economic exigency" before the ALJ, and thus it was waived.

The Board properly adopted the reasoning of the ALJ to conclude that Spurlino engaged in unfair labor practices.[13] It is uncontested that Spurlino changed its practice by hiring subcontractors and used non-unit

---

[13] Once again, the company argues that it provided the Union an opportunity to bargain, but again, the ALJ rejected this factual contention outright, and the company has not shown any reason to doubt the ALJ's conclusion.

employees from its Ohio division for the warehouse project instead of using its Indiana bargaining unit employees. This unilateral decision offended § 8(a)(5) and interfered with the right to organize under § 8(a)(1). *See Citizens Publ'g & Printing Co. v. N.L.R.B.*, 263 F.3d 224, 233 (3d Cir. 2001).

For the foregoing reasons, we DENY Spurlino's cross-petition for review and GRANT the NLRB's application for enforcement in its entirety.