In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 23-2968

CARMEN CONSOLINO, *et al.*,

*Plaintiffs-Appellants*,

*v.*

THOMAS J. DART, Sheriff of Cook County, Illinois, *et al.*,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17 C 9011 — **Jorge L. Alonso**, *Judge*.

_____

ARGUED MAY 16, 2024 — DECIDED NOVEMBER 5, 2024

_____

Before EASTERBROOK, RIPPLE, and JACKSON-AKIWUMI, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Among many duties, the Sheriff of Cook County manages the Cook County Jail. Each of the Jail's divisions has a superintendent plus multiple commanders, lieutenants, sergeants, and guards (correctional officers). Rather, each division *had* commanders until late 2017, when all were laid off. Superintendents, lieutenants, sergeants, and guards remain. Six of the former commanders contend in this

suit under 42 U.S.C. §1983 that the layoffs violated their rights under the First Amendment, applied to the states by the Fourteenth.

When the commanders were laid off, the Teamsters Union was conducting an organizing campaign. Unions represent about 90% of the Sheriff's work force, but the Sheriff viewed commanders as part of management and opposed their organization. On August 2, 2017, an administrative law judge recommended that the Illinois Labor Relations Board permit the Teamsters Union to represent the commanders in collective bargaining. (Public employers are outside the scope of the National Labor Relations Act, see 29 U.S.C. §152(2), so only state law governs unions in state or local public employment.)

Before the Board could act on this recommendation, a budget crunch arrived. The Cook County Board of Commissioners initially provided the Sheriff's Office with a budget of $625 million for Fiscal Year 2018, though the Sheriff contended that the Office needed about $50 million more. In fall 2017 the County Board repealed a tax that it had counted on to support the $625 million budget. The Board's staff told the Office that its revised FY 2018 budget would be $553 million, about $120 million less than the Sheriff thought necessary. That brought on a crisis, as FY 2018 was to begin on December 1, 2017, and the Office could not pay for all of its activities. Most of the expense of running the Office is payroll, so hundreds of positions had to be cut, in addition to achieving savings in other ways.

Teams throughout the Office discussed multiple plans for cutting payroll. One plan entailed firing all of the commanders (the County Board's staff supported this option, believing the Sheriff's Office top-heavy in management); another called

for eliminating the commanders' positions and allowing the former commanders to "bump down" to lieutenant positions (with the displaced lieutenants bumping sergeants, and so on); other possible plans included thinning all ranks (e.g., going from 25 commanders to 15, with similar cuts elsewhere). The Office ultimately concluded that removing all commanders, a well-paid rank, was faster and less disruptive than thinning all ranks or bumping down—though plenty of other workers also had to go for the budget to balance. The County Board approved a revised budget on November 21, 2017, and the new budget did not provide for the employment of any commander. Their service ended on December 4, 2017.

Three months later, the Illinois Labor Relations Board ruled that the commanders had been "supervisors" as state law defines that term, 5 ILCS 315/3(r), and therefore had lacked entitlement to engage in collective bargaining over management's opposition. *International Brotherhood of Teamsters, Local 700*, 34 PERI ¶144 (Mar. 6, 2018); see 5 ILCS 315/3(s)(2). The Constitution does not entitle any state or local worker to bargain collectively with a public employer. See, e.g., *Ysursa v. Pocatello Education Association*, 555 U.S. 353, 359 (2009); *Smith v. Highway Employees*, 441 U.S. 463, 465 (1979). But the First Amendment does create a right to lobby for governmental benefits, including those to which the applicant lacks entitlement. See, e.g., *BE&K Construction Co. v. NLRB*, 536 U.S. 516, 524–33 (2002) (describing the *Noerr-Pennington* doctrine and its exceptions). The parties have assumed that the former commanders enjoyed this sort of constitutional right when seeking representation by the Teamsters Union; we need not decide whether that assumption is correct.

The district court granted summary judgment to the Sheriff, holding that the evidence does not support an inference that the pro-union speech of any commander caused the layoffs. 2023 U.S. Dist. LEXIS 167245 (N.D. Ill. Sept. 20, 2023). The judge thought that every reasonable juror would be bound to conclude that the commanders were the victims of a budget shortfall.

The existence of a serious budget problem is undisputed. Still, the top ranks of the Sheriff's Office opposed unionization of the commanders and were disappointed by the administrative law judge's decision (and with the campaign that preceded it). Plaintiffs say that this disappointment led the Office to select their jobs for elimination, instead of taking other options such as allowing the commanders to bump down, or laying off more lieutenants or sergeants. The evidence of a connection between their speech and the layoffs is strong enough to create a jury issue, plaintiffs insist.

Like the district judge, we think not. The Illinois Labor Relations Board held that the Office was entitled to prohibit the commanders from collective bargaining, because they were supervisors who were supposed to be on management's team. Even so, letting the commanders go was not the Office's preferred course. Until the budget problem struck, the Office had not laid off or fired even a single commander, although the unionization drive began in 2013. Plaintiffs depict the layoffs as hard on the heels of the ALJ's recommendation, but the right focus is on the plaintiffs' speech, which began years earlier. The Office did not fire any commander or take other adverse action during the organizing campaign, including the proceedings before the ALJ. See *Zorzi v. Putnam County*, 30 F.3d 885, 896 (7th Cir. 1994) (discussing constitutional

protection for filing suits, which is closely analogous to pursuing administrative litigation).

Plaintiffs stress, and we acknowledge, that the Sheriff's opposition to the commanders' proposal for a union, plus the ALJ's recent decision, supplies a plausible basis in theory for inferring a causal connection between the commanders' speech and the loss of their jobs. But the facts do not support that theory.

Nothing happened to any commander until the budget problem intervened, though some response would have been expected if the Sheriff had been determined to punish pro-union speakers. More: the County Board's staff recommended that the Office dispense with the commanders, though there is no evidence that the Board's staff knew or cared about the ongoing unionization campaign.

After the County Board cut the budget, the Office did not try to get rid of union adherents among the lieutenants and lower ranks. Most of the work force was and remains unionized, and the portion represented by unions rose after the commanders (who were not part of a bargaining unit) were laid off. A personnel decision that increases the unionized fraction of the labor force is hard to depict as an anti-union-speech maneuver. All commanders were let go, without regard to any opinions they had expressed (pro, con, or neutral) on the organization campaign. Again that is hard to understand as a penalty for pro-union speech. In sum, although the record shows that the Office opposed the formation of a commanders' union, the record would not permit a jury to infer that plaintiffs' speech from 2013 through 2017 led to the layoffs in 2017.

Plaintiffs observe that in fall 2017, contemporaneous with laying off the commanders and hundreds of other workers, the Office hired 12 new employees. This does not begin to suggest that the Office's stated reason for laying off the commanders is a pretext. An organization needs not simply the right *number* of employees but also the right *mix* of employees. If the Office set a target of, say, 300 guards, and several retired, it would need to hire more even though it was simultaneously laying off workers in other categories. Plaintiffs have not argued that the pattern of hires (12 in fall 2017, about 70 in all of 2018) and the positions to which the new workers were assigned suggests that there is anything fishy about the Office's explanation that cutting out one tier of supervision in fall 2017 was a good way to save money. Indeed, almost any of the laid-off workers, in any rank, could have pointed a finger and asserted that it would have been preferable to save money elsewhere. That does not so much as hint that the real reason for the choice was anyone's speech.

Contending that an employer's decision was mistaken does not imply that it was pretextual. To show that a decision is pretextual, a plaintiff must show that the employer itself did not believe the explanation—that it is a lie, rather than just a mistake. See, e.g., *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 259 (1981); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). The Sheriff's Office had many ways to cope with the budget shortfall; choosing one rather than another (such as allowing commanders to bump down) does not imply that the explanation is pretextual. Nor does it mean that jurors rather than managers must make the effective decision about how to meet a payroll. To the contrary, the fact that multiple options were considered and competing views expressed implies a careful decisionmaking method.

Reasonable jurors could not conclude that the Office's explanation is a falsehood.

AFFIRMED

JACKSON-AKIWUMI, *Circuit Judge,* dissenting. Plaintiffs are former county correctional officers who contend that the Cook County Sheriff's Office killed two birds with a single stone called layoffs. One of those birds (the officers' effort to unionize) would be off limits. The other (a budget shortfall) would be fair game. Defendants are the Cook County Sheriff's Office and various leaders in both the Sheriff's Office and its subdivision, the Cook County Department of Corrections (collectively, the "Sheriff's Office"). They see the layoffs differently. Because I believe that a jury, not a judge, is the proper decision-maker here, I respectfully dissent.

I agree with my colleagues that there is nothing wrong with the Sheriff's Office acting efficiently when it can. *See Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003) ("We are not, after all, a super-personnel department that sits in judgment of the wisdom of an employer's employment decisions."). Here, it proved efficient for the Sheriff's Office to eliminate a layer of supervision—the commander rank to which Plaintiffs belonged—when cutting its budget. But the central question is why the Sheriff's Office rid itself of the commander rank rather than target some other rank or adopt some other budget-cutting solution. To resolve this appeal, we must determine whether the record contains enough evidence for a reasonable jury to conclude that retaliatory animus motivated the Sheriff Office's decision. I believe the record does.

## I

I begin with the facts, construed in the light most favorable to the commanders as the non-moving party at summary judgment. *See Johnson v. Edward Orton, Jr. Ceramics Found.*, 71 F. 4th 601, 609 (7th Cir. 2023).

### A. Unionization and Budget Trouble

There were twenty-five commanders in the Cook County Department of Corrections ("Department"), a department within the Cook County Sheriff's Office, until they were all fired on November 20, 2017. Years earlier, in 2013, the commanders had begun a campaign to unionize their rank. Commanders were the only group in the Department who tried to unionize between 2013 and 2017, and they were the only complete rank eliminated in 2017.

Although more than ninety percent of the Sheriff's Office staff was unionized, the Sheriff's Office opposed unionization by any level of management, including commanders. During the commanders' organizing campaign, certain Sheriff's Office leaders made negative comments about unions and collective-bargaining agreements. On separate occasions in 2015, the Department's Executive Director Nneka Jones-Tapia said that the commanders "have the audacity to want a union"; called the Teamsters Union "ignorant" and "disrespectful"; and did not want the Teamsters Union to attend a meeting about manpower. In October 2016, Michael Miller, a Department Assistant Executive Director, said "you commanders are a bunch of lazy [expletive], and now you are trying to get a union too."

In June 2017, while the unionization effort continued, Cook County provided the Sheriff's Office with a budget target of $625 million for Fiscal Year 2018. That budget target was already $50 million less than the Sheriff Office's had requested for 2018, and it relied in part on revenue anticipated from a new tax on sweetened beverages, sometimes referred to as the soda tax. But a month later, in July 2017, Cook County notified the Sheriff's Office that a looming repeal of

the soda tax would reduce the Office's 2018 budget even more.

In response, Undersheriff Zelda Whittler, second in command to Cook County Sheriff Thomas Dart, asked that Helen Burke, the Sheriff Office's Chief Legal Officer (not to be confused with Matthew Burke, who enters the picture later), assemble a team to manage the anticipated budget cuts. One of Helen Burke's first priorities was revising "Article S" of the Sheriff's Employment Action Manual. Article S related to layoffs of nonunion employees at the Sheriff's Office, and all parties agree the revisions eased those procedures. Ultimately, the Sherrif's Office revised Article S about a month before the commanders' termination.

Meanwhile, on August 2, 2017, the commanders' unionization effort finally bore some fruit. An administrative law judge for the Illinois Labor Relations Board issued a Recommended Decision and Order that day concluding that the rank of commander should be included in the Teamsters Union's petitioned-for bargaining unit. Sometime during the weeks that followed, Mario Reyes, another Department Assistant Executive Director, stated that "higher-ups" at the Sheriff's Office were upset with the decision and had reckoned it meant that the Sheriff's Office would have to "deal with another" collective bargaining agreement and would not "be able to control the commanders."

In mid-October 2017, the Cook County Board of Commissioners voted to repeal the soda tax. Two weeks later, at the end of October, the Board held a hearing on the Sheriff's Office's 2018 budget, during which multiple commissioners questioned Sheriff Dart about the layers of supervision within the Department of Corrections. A couple days later, the

County Board sent a letter to the Sheriff's Office requiring the office to submit an updated budget reduced by an additional ten percent ($62.5 million) within seven days.

Around the same time, Jeff Johnsen, the Department of Corrections Chief of Operations, sent an email to the commanders lauding their experience, knowledge, and leadership, and stating that he would rest easy knowing that the compound's operations were in their capable hands.

## B. Budget Cut Options

Chief Legal Officer Helen Burke and her team promptly began working on the County's demand that the Sheriff's Office submit a reduced budget within seven days. Three days after receiving that demand, Helen Burke wrote to Department Chief of Staff Matthew Burke and others. She asked if they could examine the savings and operational issues that would result from eliminating the commanders' rank. Notably, Undersheriff Whittler had not identified specific positions to be eliminated in her request to Helen Burke and others to examine the impacts of potential layoffs. Instead, Whittler merely directed bureau chiefs and department heads to discuss with their managers "what the operational needs were within [their] department to determine, if positions had to be eliminated, what positions would not [have] … an overall adverse impact on their offices."

Over the next few weeks, Sheriff's Office leadership made proposals to the Cook County Board President and Budget Director that did not include layoffs. These proposals included transferring forest preserve police duties to the Sheriff's Office, converting to video status hearings, transferring electronic monitoring to the Chief Judge's Office, closing

court facilities, implementing furlough days, reducing trans-portation needs, and cutting security details—each of which the County rejected.

Meanwhile, Sheriff's Office leadership internally rejected alternatives to termination for the commanders. The commanders were not permitted to be demoted, or "bump[ed]," to lower ranks. Nor were they permitted to take reductions in pay even though pay reductions were offered to other staff. Those alternatives were rejected by Sheriff's Office Chief Operating Officer Brad Curry, even though Matthew Burke, Jones-Tapia, and Johnsen thought they were operationally and fiscally feasible.

## C. Cutting the Budget

Ultimately, after consulting with Jones-Tapia, Johnsen, Miller, Matthew Burke, Helen Burke, and others, Curry decided to eliminate the commander rank. Sheriff's Office fired all commanders, plus some other employees, on November 20, 2017. The Office's final budget was approved the following day. Sheriff's Office Superintendent Joseph Brown, who had testified at a contested Illinois Labor Relations Board hearing on the Sheriff's Office's behalf—and therefore, the commanders contend, contributed to the Sheriff's Office's loss before the administrative law judge—was the only superintendent laid off around this time.

Karyn Williams, the Sheriff's Office Executive Director for Human Resources, was not consulted about the decision to terminate the commanders. In an email, Williams expressed concern to Sheriff Dart and Undersheriff Whittler about this. Her email read: "The human resources department was not involved in the process. What factors did the decision makers

consider to identify staff for the recent layoffs to prevent adverse impact and discriminatory and retaliatory decisions in the layoffs?" Within a month, Sheriff's Office leadership filed an Office of Professional Review complaint against Williams. Williams was eventually fired two weeks after her last meeting about that complaint.

## II

As my colleagues correctly observe, there is no dispute that the Sheriff's Office aimed its stone at the budget shortfall. The only dispute is whether it did so with the intention of also putting an end to the commanders' unionization effort.

The Supreme Court has set forth a burden-shifting framework for analyzing First Amendment retaliation claims. *See Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977) (articulating framework). At the first step, a plaintiff must establish a *prima facie* case by showing: (1) the plaintiff engaged in activity protected by the First Amendment; (2) the plaintiff suffered a deprivation that likely would deter First Amendment activity in the future; and (3) the First Amendment activity was "a motivating factor" in the defendant's decision to take the retaliatory action. *Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020) (quoting *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)). If a plaintiff makes that showing, the burden shifts to the defendant at the second step "to show that he would have taken the same adverse action even in the absence of the protected speech." *See Gonzalez v. Trevino*, 602 U.S. 653, 663 (2024) (Alito, J., concurring) (citing *Mt. Healthy City Bd. of Ed.*, 429 U.S. at 287). Finally, if the defendant makes that showing, the burden returns to the plaintiff to "persuade a fact-finder that the defendant['s] proffered reasons were pretextual and that retaliatory animus was the real reason" behind the

adverse action. *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006).

To show pretext, the commanders "must present evidence suggesting that the employer [dissembled.]" *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Id*. To answer that question and meet their burden, the commanders "must identify such weaknesses, implausibilies, inconsistencies, or contradictions" in the employer's proffered reason such that "a reasonable person could find [it] unworthy of credence." *Id*. (cleaned up). Importantly, we have observed that "[o]ften, the same evidence used to establish the *prima facie* case is sufficient to allow a jury to determine that a defendant's stated reason for terminating a plaintiff was a mere front for an ulterior, unlawful motive." *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 673 (7th Cir. 2009). Such evidence includes, "suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an inference of retaliatory intent might be drawn." *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (cleaned up).

My colleagues and I agree that the commanders were engaged in protected activity as they sought the protection of Illinois law for their unionization effort. *See Smith v. Ark. State Highway Emps.*, 441 U.S. 463, 464 (1979) ("The First Amendment protects the right of an individual to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances."). We also agree that the Sheriff's Office had a legitimate, non-retaliatory reason to terminate the commanders. *See ante*, at 4 ("The existence of a

serious budget problem is undisputed."). But we disagree as to whether the commanders have presented sufficient evidence for a reasonable jury to find in their favor on the ultimate question here: Was Defendants' proffered reason pretextual? As discussed below, I believe the commanders have presented enough evidence to survive summary judgment.

### A. Circumstantial Evidence of Pretext

Here, there are enough "weaknesses, implausibilities, inconsistencies, or contradictions" to present the controversy to a jury. *Castro*, 786 F.3d at 565. Broadly, the evidence falls into three categories: (1) Sheriff's Office leaders made anti-union comments, appealed an administrative law decision favoring the commanders, and generally opposed the unionization of management-level employees; (2) without much explanation, the Sheriff's Office refused alternatives to firing the commanders; and (3) Sheriff's Office leaders made inconsistent statements about whether Cook County required layoffs to effectuate the ten percent budget cut. Together, this evidence is enough to survive summary judgment in my view. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764 (7th Cir. 2016) ("Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself ….").

### 1. *Union Opposition and Anti-Union Comments*

To begin, the decision to eliminate the commanders rank came after Sheriff's Office leadership disparaged and opposed the commanders' unionization effort. Formally, the Sheriff's Office opposed the effort in court and appealed the administrative law judge's adverse decision. Informally, Sheriff's Office leadership, including Jones-Tapia, Miller, and

Reyes, made multiple anti-union comments. Recall, for instance, Miller's comment that the commanders were "a bunch of lazy [expletive] … now trying to get a union too" and Jones-Tapia's complaint that the commanders had the "audacity to want a union." We have previously observed that similar comments suggest an anti-union animus. *See, e.g.*, *Huck Store Fixture Co. v. N.L.R.B.*, 327 F.3d 528, 534 (7th Cir. 2003) (concluding that employer's motivating anti-union animus was supported by substantial evidence including company president "publicly voic[ing] his disdain for the Union"); *Spurlino Materials, LLC v. N.L.R.B.*, 645 F.3d 870, 878 (7th Cir. 2011) ("General Manager Matney's multiple anti-union statements demonstrated an atmosphere of hostility toward the Union.").

A reasonable jury could find the comments and actions above relevant to Defendants' conduct, including, for example, Helen Burke's request to Matthew Burke. When given a general directive by Undersheriff Whittler to assess the impacts of potential layoffs, Helen Burke quickly turned her sights to the commanders and the commanders alone. She did not ask Matthew Burke to examine the savings from eliminating any other rank. Viewed in a light most favorable to the commanders and considering the anti-union conduct described above, a reasonable jury could find that this specific and unprompted focus by the Chief Legal Officer was suspicious. She was, after all, fighting the commanders' unionization effort in court at the time and she had recently made it easier to fire non-union employees.

2.  *Refusing Alternatives and Excluding Human Resources*

Second, the Sheriff's Office refused alternative budgetary options without much explanation and did not include the human resources department in their deliberations. Recall,

the Office refused "operationally and fiscally feasible" alternatives, such as demotions and pay cuts, that would have saved the commanders' jobs. The rejection of those alternatives could suggest to a jury a predetermined commitment to getting rid of the unionizing commanders. Further, the email from the human resources head, Williams, could be read to suggest that she expected to be part of the layoff process. A reasonable jury, then, could consider the email evidence of foul play if the jury infers that the Sherrif's Office deviated from standard processes when terminating the commanders. *See Joll v. Valparaiso Cmty. Schools*, 953 F.3d 923, 931 (7th Cir. 2020) ("Joll's references were contacted more quickly than usual. A jury could find that this deviation from standard procedures also lends support to her claims."); *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 727 (7th Cir. 2005) ("This court has held in the past that an employer's failure to follow its own internal employment procedures can constitute evidence of pretext."); *see also Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 142–43 (1st Cir. 2012) (reasoning that failure to submit reasons for termination may be suspicious where discipline must be approved by human resources).

Together, the short shrift given to budget-cutting alternatives and the failure to consult with human resources could suggest that the Sheriff's Office was not engaged in a conscientious effort to identify the least disruptive budget maneuvers but, rather, was committed to using the budget shortfall as an excuse to eliminate an organizing campaign that was finally gaining traction. Indeed, a reasonable jury could find that the Sheriff's Office was merely "dotting their i's and crossing their t's" by ostensibly considering other options. *Cf. Baines v. Walgreen Co.*, 863 F.3d 656, 663 (7th Cir. 2017) (concluding that plaintiff presented enough evidence of

retaliatory animus to survive summary judgment where interviewers had been told they could not hire plaintiff but interviewed plaintiff anyways).

### 3. *Inconsistencies in Defendants' Proffered Rationale*

Third, the Sheriff's Office made inconsistent statements about their rationale for the layoffs. As some leaders saw it, the County Board required layoffs specifically; as other leaders saw it, the Sheriff's Office had discretion on how to cut the budget. And, apparently, some leaders even saw it both ways at different times.

For example, Sheriff Dart responded to the commanders' interrogatories as follows: "Chief Curry did not decide that layoffs should occur. Rather, when informed by Cook County that individuals in the [Sheriff's Office], particularly in [CC]DOC, must be laid off, Chief Curry ultimately made the decision to select the commanders and other individuals for such layoff …." Helen Burke likewise testified that the County required the Sheriff's Office to make cuts through layoffs. And Jones-Tapia testified, "Generally, I recall [Whittler] saying that the County wanted bodies." Whitler herself testified that "[The County Board's] position was is [sic] that the Sheriff's [O]ffice …. did not identify positions [to lay off], that in fact they would because there was no pending solution to closing this $200 million gap other than the elimination of positions." Before the district court, the Sheriff's Office repeated the idea that the County required layoffs multiple times, including arguing that budget cuts were necessary to "satisfy the County's demand that the CCSO actually lay people off."

But, as the commanders point out, those assertions were contrary to other statements made by Sheriff's Office leaders

and County Board members. For instance, Curry testified that the direction from Cook County was that the Sheriff's Office had to cut $62.5 million, but they did not say how it had to be done, and he could not recall anyone from the County Board saying the Sheriff's Office specifically had to use layoffs to reach budget goals. Helen Burke also testified, contrary to her own statement above, that she could not recall the County Board making such a request and that her team "did not know there were going to be layoffs." Further, the commanders also assert that the County Board's October 17th letter to the Sheriff's Office did not express a directive to lay off employees but rather a general directive to cut expenditures. Because this appeal is before us on Defendants' summary judgment motion and because the letter does not expressly demand layoffs, the letter should be construed in the commanders' favor as not requiring layoffs. I thus disagree with the majority's statement that "the County Board's staff recommended that the Office dispense with the commanders." *Ante*, at 5.

A jury should decide what to make of these inconsistencies. *See Simple v. Walgreen Co.*, 511 F.3d 668, 671 (7th Cir. 2007) ("[I]nconsistency is suggestive of pretext …."); *Kasten v. Saint-Gobain Performance Plastics Corp.*, 703 F.3d 966, 974 (7th Cir. 2012) ("[A]n employer's inconsistent explanations for taking an adverse employment action [is] suggestive of pretext, which, when supported by other evidence of improper motive, was sufficient to defeat a summary judgment motion in the employer's favor.") (citing *Simple*, 511 F.3d at 671); *see also O'Neal v. City of New Albany*, 293 F.3d 998, 1005 (7th Cir. 2002) ("Because a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes a summary judgment.").

### B. Suspicious Timing

In deciding whether there is sufficient evidence for a jury to weigh in favor of the commanders, the three considerations above must be assessed alongside the layoffs' timing. *See Coleman*, 667 F.3d at 860–61 (7th Cir. 2012) (observing that an inference of retaliatory intent may be drawn from suspicious timing and concluding that plaintiff offered sufficient evidence to survive summary judgment); *see also McGreal v. Ostrov*, 368 F.3d 657, 681 (7th Cir. 2004) ("The timing of these events provides a genuine issue of fact regarding the true reason for the Department's actions against McGreal.").

While the Illinois Labor Relations Board was considering the commanders' certification petition, the Sheriff's Office amended an internal policy that made it easier to lay off its employees. Then, within three days of the Board's request for a ten percent cut, the Chief Legal Officer asked the Chief of Staff what would result from eliminating the commanders. Less than a month later, it was done: the Sheriff's Office had rid itself of the unionizing commanders. That timing is suspicious enough for jury consideration and can—together with the circumstantial evidence discussed above—support an inference that the Sheriff's Office stated rationale was pretext. *Cf. Coleman*, 667 F.3d at 843–44, 861 (plaintiff fired five weeks after second EEOC complaint, five months after first EEOC complaint, and nearly eight months after first informal complaints).

On the issue of timing, my colleagues contend that the "right focus is on the plaintiffs' speech, which began years earlier [than the recommended decision]." *Ante*, at 4. They note that no commanders were laid off during the organizing campaign until the budget crisis hit, so they conclude "the

record would not permit a jury to infer that plaintiffs' speech from 2013 through 2017 led to the layoffs in 2017." *Id.* at 5 (reasoning, "[S]ome [pre-recommended decision] response would have been expected if the Sheriff had been determined to punish pro-union speakers.").

But there is reason in the record to disclaim this approach. Consider, for example, Chief Operating Officer Curry's testimony that he was not aware of the commanders' unionization effort until "sometime in late 2016 or early 2017." Moreover, a reasonable jury could believe that the commanders' protected speech did not become an actual nuisance until the administrative law judge issued the decision in August 2017 recommending that the commanders be included in a new bargaining unit. It was not until this development, perhaps, that the Sheriff's Office had to take the commanders' effort seriously. And the evidence showed that leaders within the Sheriff's Office were upset that this development meant they could no longer control the commanders. Within three months, the entire rank had been eliminated. Framed this way, the retaliation occurred mere weeks after a key point in the commanders' constitutionally protected endeavor.

A useful guidepost here is our decision in *Carlson v. CSX Transportation, Inc.*, 758 F.3d 819 (7th Cir. 2014). In that case, Carlson "alleged that the resolution of her 2007 [sex discrimination] lawsuit in 2009 sparked animosity right away and that all of her attempts to advance at CSX since then ha[d] been thwarted." *Id.* at 829. Carlson filed her initial suit against CSX in September 2007 and then settled and dismissed the case in May 2009. She alleged that retaliation then began shortly thereafter, also in May 2009. On appeal, we agreed that the proper focal point was the 2009 resolution of Carlson's initial

suit, so we reversed the district court's dismissal of Carlson's action for failure to state a claim. Carlson's settlement functioned much like the Illinois Labor Relations Board's August 2017 decision in this case. A reasonable jury could find that the recommended decision, like the Carlson settlement, prompted Defendants to act on their retaliatory intentions.

In sum, a reasonable jury could find that the Sheriff's Office decided they would use the budget crisis that had been forecast for them as early as July 2017 as cover to terminate the commanders once the administrative law decision was issued. The mere fact that Defendants then waited until shortly before the budget crisis clock struck midnight three months later does not necessarily defeat such an inference. *Cf. Hicks v. Forest Pres. Dist. of Cook Cnty.*, 677 F.3d 781, 788 (7th Cir. 2012) (holding that a twenty-two month gap was not too long where the suing employee put forward evidence that a supervisor told someone that the employee needed to be fired because he had filed discrimination charges against that supervisor); *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009–10 (7th Cir. 2000) ("Of course, the fact that a year passed between [the employee's] protected expression and her termination does not mean that she cannot prove that retaliation caused her discharge….").

### III

The six commanders who brought this suit made a *prima facie* showing of retaliation and presented enough circumstantial evidence to raise a genuine dispute about whether the Sheriff's Office's stated rationale for the commanders' layoffs was pretextual. When the record is viewed in the light most favorable to the commanders, a reasonable jury could find in their favor. For that reason, this case should have gone to a jury. I respectfully dissent.